IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 94-40897

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BEN D. CAMPBELL and JOHN G. CAMPBELL,

Defendants-Appellants.

_____

Appeals from the United States District Court for the
Eastern District of Texas

_____

(September 12, 1995)

Before GARWOOD, JOLLY, and BARKSDALE, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

John and Ben Campbell, father and son, appeal their convictions for conspiracy and bank fraud, and Ben appeals his conviction for making a false entry in bank records, all resulting from Ben Campbell's mortgage of property, which he did not own, to the now-failed Flower Mound Bank. The mortgaged property was owned by West-Butte Corporation, a small family owned company formed to develop the property. Our opinion focuses primarily on the alleged conspiracy to defraud the bank (now Security Bank of Flower Mound) by depriving it of its security. The government contends that this conspiracy to defraud the bank began only after Ben defaulted on

the loan--not when Ben mortgaged the property to the bank.  Once the bank began its attempts to foreclose on the property, John, with Ben's help, demanded release of the property and took legal action to reclaim it from the bank.  The government argues that these efforts amounted to a conspiracy to commit bank fraud.

Although we easily conclude that the evidence supports Ben's conviction for fraudulently mortgaging the property by falsely signing as president of West-Butte Corporation, we find that the evidence does not support an illegal conspiracy to deprive the bank of its security.  Because the evidence supporting the bank fraud count is the same as that supporting the reversed conspiracy convictions, we also reverse these convictions.  We thus affirm in part, reverse in part, and remand.

The facts underlying the alleged conspiracy are complicated, and the government's theory of the illegality of the conspiracy is somewhat unsure or at least not easily grasped.  To understand this appeal, we must first set out the facts in laborious detail.

I

A

In 1978, John Campbell purchased for development as a resort 6.2 acres of land near Crested Butte, Colorado (the "Crested Butte property" or the "property").  Daniel Thurman, a life-time friend and business associate of John Campbell, assisted in the development from 1978 until 1984, specifically, by attempting to obtain water rights for the Crested Butte property.  In 1984,

Thurman, John Campbell, and Ben D. Campbell--John Campbell's son and co-defendant-appellant--formed West-Butte Corporation ("West-Butte") to continue with development of the Crested Butte property. John Campbell contributed to West-Butte the Crested Butte property by warranty deed. The Crested Butte property was West-Butte's sole asset.

West-Butte's Articles of Incorporation listed its officers as Dan Thurman, president; Ben Campbell, vice president; and Shirley Thurman, secretary-treasurer. These same individuals comprised the three-member board of directors. Finally, the Articles of Incorporation authorized, but did not issue, 120,000 shares of common stock. The minutes of the initial organizational meeting for the corporation authorized and directed the president and the secretary to issue 10,000 shares to CATV Systems, Inc. ("CATV"), a corporation wholly-owned by Ben Campbell, and 10,000 shares to Ben Campbell, individually. Two stock certificates were partially completed designating CATV and Ben Campbell as the owners of the shares, but the certificates were never signed as required by West-Butte's bylaws.

B

In addition to his involvement with West-Butte, Ben Campbell owned and operated several companies, including Frontier GMC. In connection with Frontier GMC, Ben Campbell entered into a trust agreement with GMAC for supply and payment of cars. In August 1986, however, GMAC discovered that Ben Campbell sold vehicles

without paying GMAC, in violation of the trust agreement. As a result, Ben Campbell owed GMAC approximately $280,000. GMAC ultimately gave Ben Campbell until December 10, 1986, to correct Frontier GMC's financial delinquency.

To meet GMAC's demands, Ben Campbell first turned to MBank Fort Worth ("MBank"). He agreed to pledge as collateral the Crested Butte property. Upon their examination, however, MBank discovered Ben Campbell did not own the Crested Butte property; it was owned by West-Butte. Furthermore, the warranty deed conveying the Crested Butte property from John Campbell to West-Butte was defective.[1] Thus, John Campbell would need to reconvey the Crested Butte property to West-Butte. Under these circumstances, MBank denied the loan.

In late 1986, Ben Campbell turned to his own bank, Flower Mound Bank ("FMB"), where he chaired the board of directors. He applied for a $90,000 loan[2] and again agreed to pledge the Crested Butte property as collateral for his loan. This deal was more complicated, however, because Ben had ten prior unsecured notes held by FMB and executed by Ben, individually, or on behalf of one

---

[1]The deed was defective under Colorado law because it failed to designate the grantee, West-Butte Corporation, as a Colorado corporation.

[2]Ben Campbell testified that he told the board of directors that the purpose of the loan was to resolve Frontier GMC's financial problems. FMB's loan committee approval form, however, stated that the purpose of the loan was to provide operating funds for another of his ventures, El Centro Ranch.

of his companies. Thus, it was agreed that the Crested Butte property would serve as security for all of Ben's indebtedness.

Joseph Ackley, president of FMB during the time this transaction took place, asked attorney Boyd Newman, a director of FMB, to provide legal services with regard to Ben Campbell's loan. Newman refused to act as FMB's attorney in this matter, but contacted Robert Wright, a Colorado attorney, to assist in preparing a mortgage in favor of FMB and obtaining title insurance. After performing a title search, Wright informed Newman that West-Butte--not Ben Campbell--owned the Crested Butte property. Newman then advised Ackley that a corporate resolution from West-Butte was needed in order to grant Ben Campbell the authority to encumber West-Butte's property. Amazingly, FMB never obtained a corporate resolution from West-Butte allowing Ben Campbell to mortgage the Crested Butte property. Wright also informed Newman that the warranty deed conveying the Crested Butte property from John Campbell to West-Butte was defective. Newman asked Wright to prepare a correction deed and a mortgage in favor of FMB.

Wright prepared a quitclaim deed from John Campbell to West-Butte and a mortgage on the Crested Butte property from West-Butte in favor of FMB and sent these documents to Newman. On December 8, 1986, John executed the quitclaim deed correcting the title problem[3] and the deed was properly notarized. The quitclaim

---

[3]At trial, Ben Campbell testified that he told John Campbell that because of a problem with the filing of the warranty deed,

deed was filed in Colorado and vested clear title to the Crested Butte property in West-Butte. On December 10, 1986, Ben Campbell executed the mortgage in favor of FMB. The mortgage was signed on behalf of West-Butte by "Ben Campbell, as President" and his wife, "Phyllis Campbell, as Secretary." Ben then gave Wright authorization to affix a blank seal of West-Butte on the mortgage.

Ben next engaged in a series of actions in an effort to provide corporate ratification for his false signature as president of West-Butte. On December 15, 1986, Ben asked Phil Klingsmith, West-Butte's attorney, to send him West-Butte's corporate seal and to issue the West-Butte stock 50% to him and 50% to his wife. Klingsmith sent the seal and unsigned stock certificates. Furthermore, Ben Campbell testified that, additionally, on December 15, he conducted a "special meeting" of the shareholders and appointed himself president of West-Butte and his wife secretary/treasurer.[4] However, the annual corporate reports filed on behalf of West-Butte from June 1986 through June 1989 reflected no change in the officers chosen to serve at West-Butte's

---

John Campbell needed to reconvey the Crested Butte property to West-Butte by quitclaim deed so that West-Butte would hold clear title to the Crested Butte property.

[4]During the investigation of this case before trial, John Campbell told a Federal Bureau of Investigations ("FBI") agent that he saw reorganization papers (i.e., the minutes from the "special meeting" of shareholders) that might have given Ben Campbell the authority to mortgage the property.

inception--Dan Thurman as president; Ben Campbell as vice-president; and Shirley Thurman as secretary/treasurer.

Things did not improve for Ben Campbell. On April 28, 1987, Ben filed for bankruptcy in the United States Bankruptcy Court for the Eastern District of Texas, individually, and on behalf of the companies he owned, including CATV, El Centro Ranch, and Frontier GMC. Ben advised FMB that he would not contest foreclosure on the Crested Butte property. The Texas bankruptcy court, however, determined that it did not have jurisdiction to resolve any claim to the Crested Butte property because it was located in Colorado. Ben Campbell was discharged in bankruptcy.

The bank's claim on the Crested Butte property, however, remained unresolved. On January 31, 1989, Security Bank of Flower Mound ("Security Bank")[5] made a demand on Ben Campbell, as required under Colorado law, for the amount of the defaulted promissory notes secured by the mortgage on the Crested Butte property. On February 16, Security Bank filed a complaint in Colorado state court requesting foreclosure on the Crested Butte property. The complaint was served on Klingsmith, the registered agent for West-Butte. Security Bank also filed a notice of lis pendens to prevent any conveyance of the property. Because no answer was filed on

---

[5]On March 3, 1988, the Federal Deposit Insurance Corporation (the "FDIC") declared FMB insolvent and sold all of its assets to Security Bank.

behalf of West-Butte,[6] the Colorado court entered a default judgment against the Crested Butte property on May 10, 1989.[7] The court denied West-Butte's motion to set aside the default judgment and scheduled a sheriff's sale of the Crested Butte property for June 30.

C

West-Butte, led by John Campbell, fought back. On June 28, 1989, to prevent sale of the Crested Butte property, the board of directors of West-Butte, including Ben Campbell, authorized the voluntary bankruptcy of West-Butte. On June 30--before the time of the scheduled sheriff's sale--West-Butte filed bankruptcy in the United States Bankruptcy Court for the District of Colorado through its bankruptcy attorney David Oppenheim. The sheriff's sale of the Crested Butte property was stayed.

West-Butte's legal battle to claim the property went forward. On September 15, 1989, the voluntary bankruptcy petition of West-Butte was dismissed on West-Butte's motion. Thereafter, on September 25, 1989, at John Campbell's instruction, Brad Breslau, West-Butte's appellate attorney, appealed the default judgment

---

[6]Thurman testified that he received a letter from Klingsmith on February 28, 1989, stating that he accepted service of the summons and complaint in the foreclosure action. Thurman stated that he instructed Klingsmith that he would take no action against the foreclosure because he was no longer involved with the Crested Butte property or West-Butte. He further stated, however, that John Campbell was handling any matters concerning the property.

[7]The court did not enter judgment against Ben Campbell because he had been discharged in bankruptcy.

entered against the Crested Butte property in the foreclosure action. On November 21, 1990, the Colorado appellate court reversed the default judgment entered by the lower court in the foreclosure action.[8] In the meantime, West-Butte failed to post an appeal bond, which was a condition of the stay on the sale of the Crested Butte property. Security Bank proceeded to purchase the property on October 11, 1989, subject to a right of redemption. West-Butte filed a lis pendens notice preventing further sale of the Crested Butte property.

D

We now turn the clock back a bit to examine John Campbell's culpability in the alleged illegal conspiracy.

John Campbell learned of Ben Campbell's unauthorized mortgage no later than early 1987, when, after unsuccessful attempts at development as a resort, John Campbell and Daniel Thurman listed the Crested Butte property for sale. In early 1987, Thurman learned through the real estate agent with whom the property was listed that the Crested Butte property was pledged as security to FMB by Ben Campbell. Thurman then contacted Klingsmith and both men informed John Campbell of the mortgage. Both Thurman and Klingsmith testified that John Campbell seemed genuinely surprised and angered that Ben Campbell mortgaged the property when he

---

[8]The court held that because the trial court failed to provide West-Butte three days notice before entering the default judgment as required under Rule 55(b) of the Colorado Rules of Civil Procedure, the judgment was void.

clearly did not have the authority to do so. The government, on the other hand, argued at trial that John Campbell not only knew of the unauthorized mortgage at the time that it was made in December 1986, but also aided and abetted Ben Campbell in deceiving the bank with the defective mortgage. The jury, however, acquitted John of aiding and abetting Ben in this crime.

Upon learning of Ben Campbell's unauthorized mortgage of the Crested Butte property, John Campbell took various steps to prevent FMB and later Security Bank from foreclosing on the Crested Butte property. Both Thurman and John Campbell instructed Klingsmith to inform FMB that the mortgage was invalid because Ben Campbell lacked the authority to pledge West-Butte's property. On February 8, 1988, Klingsmith sent a letter to Joe Ackley, the president of FMB, stating that the mortgage executed by Ben Campbell was invalid because it was not executed by Daniel Thurman as president or Shirley Thurman as secretary, and demanded that the mortgage be released. John Campbell additionally contacted Ackley and told him that Ben Campbell did not have the authority to pledge the Crested Butte property.

John Campbell also made several unsuccessful demands on Security Bank for settlement of the dispute over the Crested Butte property. Sometime during April or May 1988, John contacted Gary Acker, the first president of the newly organized Security Bank, and stated that Ben did not have the authority to mortgage the Crested Butte property. John offered to settle the dispute with

Security Bank and, when his offer was refused by Acker, John stated that he would pursue his claim "even if he had to go to the Supreme Court." Additionally, John told Security Bank vice president Frank Sheer that Security Bank would have the Crested Butte property over his dead body. Months later, John again contacted Acker. He suggested a settlement with Security Bank and again threatened to take his case all the way to the Supreme Court when Acker refused his offer to settle.

Sometime after November 21, 1990, when the Colorado appellate court reversed the default judgment, John Campbell[9] and Security Bank, through its new president, Bill Ellis, began negotiations to settle. Ellis testified at trial that John Campbell informed him that Ben did not have the authority in 1986 to pledge the property to FMB. He made the decision to settle, however, after examining Security Bank's records on this loan and realizing that FMB actually had failed to obtain a corporate resolution. On January 18, 1991, West-Butte's board of directors (i.e., John Campbell, Dan Thurman, and Jo Campbell) authorized John to enter into a settlement with Security Bank on behalf of West-Butte for the Crested Butte property. All parties agreed upon and signed the settlement--Ellis for the bank, John Campbell as president of West-Butte, Ben Campbell, individually, and on behalf of both Frontier

_____

[9]On September 14, 1990, a corporate report was filed listing John G. Campbell as president, Dan Thurman as vice-president, and John Campbell's wife, Jo Campbell, as secretary/treasurer. These same three individuals comprised the entire board of directors.

GMC and CATV. The Crested Butte property was then sold for $320,000. John Campbell, the original contributor of the property, received $150,000 from the proceeds of the sale.[10]

II

Based on their actions taken to prevent foreclosure on the Crested Butte property, John Campbell and Ben Campbell were indicted on conspiracy to commit bank fraud in violation of 18 U.S.C. § 371 and on the substantive offense of bank fraud in violation of 18 U.S.C § 1344. Additionally, Ben Campbell was indicted on the charge of false entry in bank records with intent to deceive in violation of 18 U.S.C. § 1005 because of his false signature as president of West-Butte on the mortgage to FMB and John Campbell was charged with aiding and abetting in this offense. Both defendants were convicted of bank fraud and conspiracy to commit the same. Ben Campbell alone was convicted of false entry in bank records; John was acquitted.

On appeal, both John and Ben Campbell argue that the evidence presented at trial is insufficient to convict them of conspiracy to commit bank fraud and of bank fraud. Ben additionally argues that the evidence is insufficient to convict him of false entry in bank records. Ben finally argues that the district court erred in admitting evidence of his other financial difficulties and evidence

---

[10]On its face, the final settlement does not appear to have shortchanged the bank--the bank realized $150,000 plus on security it acquired when it made a $90,000 loan.

of his other civil banking violations. In addition to the sufficiency of the evidence arguments, John argues that the district court erred first in admitting evidence of Ben's civil banking violations because this evidence deprived him of a fair trial and also in refusing to grant his motion for severance from Ben.

### III

In reviewing the sufficiency of the evidence, we determine whether, "viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, a rational jury could have found the essential elements of the offense beyond a reasonable doubt." United States v. Rodriquez, 993 F.2d 1170, 1175 (5th Cir. 1993). A verdict must be upheld if there is substantial evidence to support it. United States v. Kindig, 854 F.2d 703, 706-07 (5th Cir. 1988). We turn first to Ben's conviction for a false entry in bank records.

### A

To prove Ben Campbell made a false entry with intent to deceive in violation of § 1005, the government must prove beyond a reasonable doubt that (1) the entry was false; (2) Ben Campbell either made the entry or caused it to be made; (3) Ben Campbell knew the entry was false when he made it; and (4) he intended that the entry injure or deceive the bank officers. United States v. Jackson, 671 F.2d 216, 219 (5th Cir. 1980).

The government argued at trial that Ben Campbell made a false entry in the records with intent to deceive the bank when he submitted to FMB the real estate mortgage on West-Butte's property, which he had falsely signed as president of West-Butte.[11]  Ben Campbell agrees that he made a false entry in the records of FMB, but argues that he did not intend to deceive FMB, a requirement under § 1005.  Therefore, our only task here is to determine whether a rational juror could have concluded that Ben Campbell intended to injure or deceive the officers of FMB when he submitted the mortgage signed as president of West-Butte.

On December 10, 1986, when Ben Campbell signed the mortgage, West-Butte's Articles of Incorporation had authorized, but had not issued 120,000 shares of stock.  Of these 120,000 shares, 10,000 shares were designated for Ben Campbell, individually, as owner,

_____

[11]Implicit in the government's theory that Ben intended to defraud FMB was that he had no authority from anyone to sign on behalf of West-Butte.  If, for example, John had acknowledged that Ben had authority to give the mortgage to the bank, and if there had been no effort to regain the Crested Butte property, it is certain that no criminal prosecution would have resulted from the fact that Ben signed the mortgage as president of West-Butte when in fact he was not.  Yet the government's argument--at least before John's acquittal on this charge--to support the illegal conspiracy count was that John had in fact authorized Ben to mortgage the property to the bank.  The government continues to argue that John's statement to the bank that he had not authorized Ben to make the mortgage is a misrepresentation, suggesting that John in fact authorized Ben to make the mortgage; it seems to us that if the government truly believed that John authorized Ben to make the mortgage, then it is difficult to contend at the same time that Ben gave the mortgage with the intent to deceive the bank.  To be sure, however, the government's position on this and other related points is fuzzy.

and 10,000 shares were designated for CATV as owner. Ben Campbell owned 100% of the stock of CATV. Ben therefore contends that at the time he signed the mortgage as president of West-Butte he thought that he owned West-Butte and its sole asset--the Crested Butte property--because he owned 100% of the issued stock.

The government contends that Ben Campbell's rejected loan attempt with MBank established his knowledge that the land was owned by West-Butte. Furthermore, the government argues that his signature on the mortgage was not a mistake because he similarly signed a statement to Wright giving him the authority to impose the blank corporate seal of West-Butte on his mortgage. Finally, the government contends that Ben Campbell's motive is clear from his unstable financial condition and need for money to support Frontier GMC.

We agree that the evidence presented at trial is more than sufficient for a reasonable juror to conclude that Ben Campbell intended to deceive FMB when he falsely signed the mortgage as president of West-Butte. In fact, with the exception of his own self-serving testimony, the record fails to reflect any substantial testimony that Ben did not intend to deceive FMB by signing as president. In any event, viewing the evidence, as we must, in the light most favorable to the jury's verdict, we affirm Ben Campbell's conviction for false entry in bank records.

We now turn to consider the sufficiency of the evidence supporting the defendants' convictions for conspiracy to commit bank fraud.

B

(1)

To establish a violation of 18 U.S.C. § 371, the government must prove beyond a reasonable doubt (1) that two or more people agreed to pursue an unlawful objective; (2) that the defendant voluntarily agreed to join the conspiracy; and (3) that one or more of the members of the conspiracy committed an overt act to further the objectives of the conspiracy. United States v. Tullos, 868 F.2d 689, 693 (5th Cir.), cert. denied, 490 U.S. 1112, 109 S.Ct. 3171, 104 L.Ed.2d 1033 (1989). The government argues that the unlawful object of the conspiracy was to defraud the bank in violation of 18 U.S.C. § 1344 by depriving the bank of all or part of the value of the Crested Butte property. Fraud under § 1344 involves the knowing execution of or attempt to execute a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations or promises. United States v. Barakett, 994 F.2d 1107, 1110 (5th Cir. 1993). A "scheme to defraud," under § 1344(1), includes the use of fraudulent pretenses or representations intended to deceive to obtain something of value from a financial institution. Barakett, 994 F.2d at 1111. Intent

to defraud is established if the defendant acted knowingly and with the specific intent to deceive.  United States v. Saks, 964 F.2d 1514, 1518 (5th Cir. 1992).  Under § 1344(2), the defendant must make a material misrepresentation to the bank, which is defined as one having "the natural tendency to influence, or was capable of influencing the decision of the lending institution."  United States v. Heath, 970 F.2d 1397, 1403 (5th Cir. 1992).

(2)

As noted, the government argued to the jury that the purpose of the conspiracy was to "prevent Security Bank from getting all or part of the value of [the] land."  The government's present theory of the illegality of the object of the conspiracy is unclear from the briefs and from oral argument.  The indictment alleges (and the government argued to the jury as well) that the scheme to defraud did not actually begin until on or about May 1987.  After Ben Campbell filed bankruptcy and the need for foreclosure became evident, the defendants devised a scheme to defraud FMB and Security Bank of the Crested Butte property by obstructing foreclosure and by threatening future litigation if FMB or Security Bank refused to release a portion of the value of the Crested Butte property.  The indictment charges that John and Ben Campbell advanced this scheme by threatening and initiating litigation from October 1987 until January 1991, against FMB and Security Bank.  They further promoted the scheme by causing Security Bank to enter into a settlement whereby the Crested Butte property was sold and

-17-

John Campbell, as trustee, obtained partial value.  Finally, the indictment states that John Campbell, having known of and assisted Ben Campbell in the fraudulent pledge, made false representations to FMB and Security Bank that he was not aware of, and that he did not agree to Ben Campbell's pledge of the Crested Butte property.

Thus, before the jury acquitted John of involvement in Ben's fraudulent pledge to the bank, the government's theory of the illegality of the conspiracy to deprive the bank of the Crested Butte property was predicated on a contention that John was aware of and assisted in the fraudulent pledge of the property at the time it was given to FMB.  In view of John's acquittal of the aiding and abetting charge, the government stated at oral argument that it does not base its theory of the illegality of the conspiracy on the fact that John Campbell assisted in the pledge of the Crested Butte property.  The government apparently does contend, however, that John nevertheless knew of the pledge when given to the bank, yet said nothing until it was necessary to regain the property.[12]  For purposes of our analysis, we will

---

[12]At oral argument, the government contended at one point that John knew of the false pledge when made on December 10, 1986, and at another point--because of John's acquittal on the false entry count--that he learned of the fraudulent pledge at some indefinite time after December 10, 1986, but before the alleged conspiracy began in May 1987.  John Campbell argues that there is no evidence that would support, beyond a reasonable doubt, that he knew of Ben's mortgage of the property on December 10, 1986.  We agree that the evidence supporting John's knowledge on this date is thin.  We avoid, however, analyzing this evidence to determine whether it would support the jury's verdict because for purposes of this opinion we accept what still appears to be the government's

therefore assume, as the government argues, that John Campbell in fact knew of the mortgage when given.  Against this backdrop, we turn to examine the evidence supporting the government's theory of the illegality of the conspiracy.

(3)

We begin by examining the claims of John Campbell, West-Butte, and FMB and Security Bank to the Crested Butte property.  West-Butte, as the owner of the Crested Butte property, clearly had a legal right to contest the bank's security because Ben Campbell at no time had the authority to pledge the property.[13]  John Campbell held at least an equitable claim to the security because he contributed the property to West-Butte as its sole asset and had not been compensated for it.  On the other hand--a point on which the government agrees--neither FMB nor Security Bank held a valid lien on the Crested Butte property at any time material to this appeal.  Instead, FMB and Security Bank had, at most, some equitable claim, which was weakened on account of the bank's knowing failure to obtain a corporate resolution authorizing Ben Campbell to pledge West-Butte's property.  Thus, on the face of these facts, it was hardly illegal for John Campbell or West-Butte

---

contention that John had knowledge of the false pledge on December 10, 1986.

[13]It is clear that West-Butte owned the Crested Butte property; what is unclear is who owned West-Butte.  As we have earlier noted, although West-Butte initially authorized 120,000 shares of stock, none of these shares were formally issued--20,000 were designated, but not issued, for Ben and his company, CATV.

to pursue legal remedies--specifically, the bankruptcy proceeding and the appeal of the default judgment--to enforce the rights of West-Butte against the admittedly invalid mortgage to Security Bank.

(4)

In contending that John and Ben conspired to deprive Security Bank of its collateral the government focuses primarily on the conduct of John, who was the active "co-conspirator"; Ben's part in the conspiracy, according to the government, was limited to his approval of West-Butte's bankruptcy and execution of the settlement agreement--essentially a passive role. Consequently, our analysis focuses primarily on John's conduct. If John did not conspire to commit bank fraud, obviously, Ben could not conspire with himself.

To establish the object of bank fraud, the government must show that John Campbell conspired to deprive Security Bank of the Crested Butte property either through some scheme of deceit or through material misrepresentations. Thus, we begin with the premise that, absent some scheme of deceit or material misrepresentation, John Campbell was entitled to act as he did in pursuing available legal remedies to regain control of the Crested Butte property for West-Butte. Stated differently, John Campbell's actions taken simply to <u>deprive</u> Security Bank of the collateral securing the invalid mortgage, without more, do not amount to bank fraud. It is clear that whatever deceit John may have employed, it was not of a surreptitious or of a clandestine nature: through

-20-

plain conversations and direct legal action, he was as open as the sky.

Although the government argues that West-Butte's bankruptcy proceeding and its appeal of the default judgment entered against the Crested Butte property constituted part of the conspiratorial scheme, the government does not demonstrate how John Campbell deceived Security Bank through these legal proceedings into signing the settlement agreement that deprived it of a portion of the value of the security. In short, the government simply failed to present adequate evidence of John Campbell's intent to deceive to transform his lawful actions into a scheme to commit bank fraud. Thus, we look only to whether John, in his effort to regain the property, deceived the bank through material misrepresentations.

According to the government's argument, the misrepresentations that John Campbell took to regain the Crested Butte property began with his demands on FMB through Klingsmith to release the Crested Butte property because FMB's lien was invalid. Next, John made representations to FMB and Security Bank that Ben had no authority to pledge the Crested Butte property. He further represented to FMB and Security Bank that he neither knew of nor authorized Ben Campbell's fraudulent pledge. He therefore demanded that FMB and Security Bank settle the dispute over the Crested Butte property. In sum, the government alleges that John Campbell made the following misrepresentations to FMB and Security Bank: that he

never agreed to Ben's pledge of the property; that he had not authorized it; and that he did not know of it until much later.

As we have noted, the record contains no evidence that John Campbell authorized Ben Campbell's false pledge; indeed, only a corporate resolution, which the bank knowingly failed to obtain, could have authorized Ben to pledge the property to satisfy his personal debts.[14] Moreover, the government's argument on appeal is not premised on any culpable involvement of John in Ben's falsely signing the mortgage as president of West-Butte. Thus, the government's argument concerning John's misrepresentations can assume at most that John knew of the mortgage and said nothing to the bank until it attempted to foreclose on the property. It is in this light that we must evaluate whether his subsequent statement to FMB and Security Bank that he did not know of the pledge constituted a misrepresentation. The more precise question, however, is whether John's statements concerning his lack of knowledge were material misrepresentations,[15] i.e., that they had

_____

[14]Although the record contains ample evidence that John did inform the bank that he did not know of the pledge and that Ben had no authority to pledge the property, our review of the record reveals no representation by John to the bank that he did not authorize the pledge. In fact, John held no position to authorize such an encumbrance on the property, as indeed the government itself points out in support of the conspiracy count. We nevertheless address this contention of the government.

[15]As is clear from the facts above, John Campbell had no relationship with FMB concerning this loan. It was not until he demanded the release of the Crested Butte property that he had any contact with the bank concerning the mortgage. Absent any relationship other than that created by John's claim to the same

the natural effect of influencing Security Bank's decision to settle the controversy over the security.  See Heath, 970 F.2d at 1403.

As Security Bank's president testified, Security Bank agreed to settle the dispute only after reviewing its records and realizing that it held an invalid lien on the security because of FMB's failure to obtain a corporate resolution.  Thus, Security Bank recognized that it had no legal claim to the Crested Butte property.  The government clearly had the burden of proof to show that John's simple knowledge--under whatever circumstances he may have gained that knowledge--would have had the natural effect of influencing the bank's decision to settle the case, a burden the government has failed to satisfy.  The government adduced no evidence that Security Bank settled the dispute because of John's statements concerning his lack of knowledge.  In point of fact the bank apparently disregarded such statements until the default judgment against the property was reversed and Security Bank was threatened with actually losing the security because of the weakness of its legal position.  We thus conclude that the evidence fails to show that Security Bank was deprived of part of the value

---

property as that claimed by the bank, it is difficult to see either what special obligation John had to distill the truth to the bank or indeed what right the bank had to rely on any representations he may have made.  Generally speaking, one does not burden himself with special duties as a claimant to disputed property.

-23-

of its security because of any material misrepresentation of John Campbell.

In sum, we find that the evidence is insufficient to support a finding that John Campbell conspired to commit bank fraud. John Campbell acted within the perimeters of his legal rights to assert the claims of West-Butte against this admittedly invalid mortgage. Moreover, in asserting the claims of West-Butte--and thereby his own claims indirectly--he engaged in no material misrepresentation to the bank. Our finding that John did not engage in an illegal conspiracy necessitates vacating Ben's conviction for conspiracy as well, as a single defendant cannot conspire with himself.

We turn now to examine the evidence supporting the defendants' convictions for the substantive offense of bank fraud.

C

The indictment charges both defendants with committing bank fraud, specifically, from March 1987 until June 1991. It charges that the defendants, having devised a scheme to defraud the bank of its security, executed this scheme by causing Security Bank to enter into the settlement agreement depriving it of a portion of the value of the security. The government argues that the defendants achieved this fraud by the same manner and means as employed in the conspiracy. Furthermore, the government relies on the same evidence supporting the defendants' convictions for conspiracy to support their convictions for bank fraud.

For the same reasons we found that John Campbell did not conspire to defraud FMB or Security Bank of the security, we hold that he did not commit the substantive offense of bank fraud. Accordingly, we reverse his remaining conviction for bank fraud.

As to Ben Campbell, the government in its brief summarily states "once the conspiracy to commit bank fraud is established, Ben Campbell is liable for his father's foreseeable violation of 18 U.S.C. § 1344 even if he did not act himself to defraud Security Bank." Because we have held that John Campbell in fact did not commit bank fraud and because there is no evidence that Ben Campbell deceived Security Bank during the relevant time frame for the charged bank fraud offense, we hold that Ben's conviction for bank fraud must be reversed as well.

IV

In conclusion, we find insufficient evidence for a rational juror to convict John and Ben Campbell of either conspiracy to commit bank fraud or bank fraud as charged in the indictment. Accordingly, we REVERSE and VACATE each defendant's conviction on these offenses. We AFFIRM Ben Campbell's conviction on false entry in bank records. We therefore REMAND this case to the district court for entry of a judgment of acquittal as to John Campbell and

resentencing as to Ben Campbell.[16]  The judgment of the district court is therefore

AFFIRMED in part;
REVERSED and VACATED in part;
and REMANDED.

---

[16]We need not address John Campbell's remaining arguments because we find the evidence insufficient to convict him of either conspiracy or bank fraud.

Ben Campbell additionally argues that the district court abused its discretion in admitting evidence of his violations of certain banking regulations, such as the regulation limiting indebtedness to "one borrower," and in admitting evidence of his financial difficulties with Frontier GMC.  Because we find this evidence relevant to Ben's intent to deceive in the false entry count, the district court clearly did not abuse its discretion by admitting this evidence. United States v. Hays, 872 F.2d 582, 587 (5th Cir. 1989) (reviewing district court's evidentiary rulings only for abuse of discretion).  In any event, because the evidence supporting Ben's remaining conviction--false entry--is so overwhelming, any error resulting from admission of this evidence is harmless. See FED. R. CRIM. P. 52(a) (disregarding any error not affecting substantial rights).