IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————————————

No. 99-20695

———————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee-Cross-Appellant,

v.

ALI REZA DADI, also known as Raymond Dadi,

Defendant-Appellant-Cross-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Texas

_____

December 20, 2000

Before KING, Chief Judge, CUDAHY[*], and WIENER, Circuit Judges.

CUDAHY, Circuit Judge:

On February 23, 1999, a grand jury charged that Ali Reza Dadi, Homa Dadi (his sister) and Siamak Mackvandian entered into an agreement among themselves and others to execute a scheme to defraud federally insured financial institutions. Dadi was convicted and sentenced to serve 84 months in prison. He appeals and we affirm.

## I. Factual and Procedural Background

The 17-count superseding indictment charged Ali Reza Dadi

---

[*] Circuit Judge of the United States Court of Appeals for the Seventh Circuit, sitting by designation.

1

with one count of conspiracy, in violation of 18 U.S.C. § 371; one count of aiding and abetting bank fraud, in violation of 18 U.S.C. § 1344; and 15 counts of aiding and abetting the conduct of monetary transactions with criminally derived property, in violation of 18 U.S.C. § 1957. A jury trial was held in the Southern District of Texas, Houston Division, and on March 26, 1999, the jury found Dadi guilty on all counts. On April 16, the district court denied Dadi's post-verdict motion for a judgment of acquittal and then ordered the preparation of a pre-sentence investigation report (PSR). In carrying out that task, the probation officer grouped the offenses and based Dadi's offense level on the Sentencing Guideline applicable to a violation of the money laundering statute, 18 U.S.C. § 1957. Under that Guideline, Dadi's base offense level was 17. Four levels were then added under U.S.S.G. § 2S1.2(b)(2) for the amount of money derived from the bank fraud (more than $600,000). Four additional levels were added since Dadi was an organizer or leader in the offense which involved more than five participants. See U.S.S.G. § 3B1.1(a).

In addition, Dadi had four prior convictions, giving him six criminal history points. Further, because Dadi committed this offense while awaiting designation to a prison facility on a prior obstruction of justice conviction, two more points were added to his criminal history score under U.S.S.G. § 4A1.1(d).

2

Given his offense level of 25 and criminal history category of IV (based on his eight criminal history points), Dadi's imprisonment range was 84 to 105 months.

Before sentencing, the government filed a notice of intent to enhance the sentence for committing the offense while on release on another offense (18 U.S.C. § 3147 and U.S.S.G. § 2J1.7) but the district court rejected this enhancement. On July 12, the district court sentenced Dadi to serve 84 months in prison, followed by a five-year term of supervised release. The court also ordered Dadi to pay $161,239 in restitution and $1,700 in special assessments. The clerk entered a notice of appeal on Dadi's behalf, and a federal defender was appointed to represent him on appeal. The government cross-appealed the district court's rejection of the § 2J1.7 enhancement.

Viewing the facts in the light most favorable to the verdict, we will attempt to describe the multifarious scheme concocted by Dadi and his co-conspirators. They had access to numerous bank accounts into which they deposited counterfeit checks. The various parties to the conspiracy later withdrew funds from these accounts to use for their own benefit. The process began when Dadi persuaded Yvonne and Yvette Reyes, his wife's cousins, to allow him to use the bank account of their deceased mother, Stella Reyes. Dadi offered to pay the sisters $10,000 for the use of Stella's account at Texas Commerce Bank.

He later deposited a counterfeit check in the amount of $95,728 into that account. That money was later withdrawn, re-routed through the account of one of Dadi's confederates and then in the form of cash dropped into Dadi's pocket.

Dadi also deposited counterfeit checks into the bank accounts of Southwest Oil Company and N&M Petrochemical Company, which were maintained at Texas Commerce Bank and Highlands Bank, respectively. Those accounts had been opened by Naser Khayambashi. On May 30, 1997, a counterfeit check for $130,000, drawn on Gillman Auto Group's account at Nationsbank in North Carolina, was deposited into the Southwest Oil account at Texas Commerce Bank. On June 5, a $77,650 counterfeit Gillman check was deposited into the same account.

A check for $50,000 was later drawn on the Southwest Oil account, payable to Siamak Mackvandian, who used the proceeds to purchase a Texas Commerce Bank check for $41,000 payable to Logistic Express.[2] This check was signed by Khayambashi.[3] Mackvandian deposited that check into his Logistic Express

---

[2]According to Mackvandian's testimony, Dadi had given him this counterfeit check, and the handwriting on the payable-to line looked like Dadi's. He also testified that the $9,000 remainder was received in cash, and split between Dadi and him.

[3]Loretta Wolsey, a lead analyst for the fraud prevention unit of the Chase Bank of Texas, testified that Khayambashi had opened the Southwest Oil Company account. Khayambashi also owned N&M Petrochemical. The $53,000 counterfeit check deposited into that account was drawn on one Ebrahim Yazdanpanah's account. Khayambashi was indicted by a Texas grand jury in connection with that counterfeit check.

4

account at Wells Fargo Bank, and—two days later—issued a check drawn on that account for $30,000, payable to Dadi. Dadi used the proceeds of this check to purchase a Wells Fargo cashier's check in the amount of $20,500, which he deposited into his Frost National Bank account. Later, Mackvandian and Dadi issued a check for $4,000, drawn on the Wells Fargo Logistic Express account, payable to Mackvandian. The proceeds were provided to Dadi.

A check was drawn on the N&M Petrochemical account (into which counterfeit checks had been deposited) for $52,000, payable to Homa Dadi, who deposited the check into her Coastal Banc account. The drawee was designated in Dadi's handwriting. The following day, Dadi and Homa Dadi issued a check drawn on N&M Petrochemical for $40,000, payable to Dadi. Dadi then deposited that amount into his Frost National Bank account. Later, Dadi and Homa Dadi drew a check on Homa Dadi's Coastal Banc account for $1,500, payable to Dadi.

Dadi issued a check for $9,500, payable to Yvette Reyes. Seven days later, Dadi issued three checks payable to Yvette Reyes: one for $9,000 and two for $16,000. Yvonne and Yvette Reyes used these funds to purchase a house for the use and benefit of Dadi's family. Dadi and his wife Carmen later sold the house without the knowledge of the Reyes sisters. The following month, a counterfeit check drawn on "Southern Polymer"

for $95,728 was deposited into the account of Stella Reyes at the Texas Commerce Bank; Dadi allegedly made this deposit.[4] Later that month, Dadi and Mackvandian issued a check for $42,500, drawn on the Stella Reyes account and payable to Mackvandian, who deposited this check into his account at the Frost National Bank. Mackvandian then issued a check drawn on that account payable to "cash" and used the proceeds to purchase a cashier's check payable to All American Delivery. This check was deposited into Mackvandian's All American Delivery account at Bank United. Mackvandian later used the proceeds to purchase a cashier's check for $25,000 payable to Logistic Express and deposited that into the Wells Fargo Bank Logistic Express account. He then drew a $24,5000 check on this account and gave the proceeds to Dadi.

The $95,728 deposit into the Stella Reyes account was the basis for the charge of bank fraud. The checks drawn against the counterfeit funds in amounts exceeding $10,000 were the basis for the money laundering violations.

## II. Sufficiency of the Evidence

In determining whether the evidence was sufficient to support a conviction, we review all the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the defendant guilty beyond a

---

[4]Harry Watson, a controller with a company called Southern Polymer, testified that this check was not authentic, and the signatures on the check were forged.

reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Aubin, 87 F.3d 141, 144 (5th Cir. 1996); United States v. McDow, 27 F.3d 132, 135 (5th Cir. 1994) (also noting that the reviewing court must "accept all reasonable inferences which tend to support the jury's verdict").  "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence."  United States v. Bermea, 30 F.3d 1539, 1551 (5th Cir. 1994), cert. denied, 513 U.S. 1156 (1995).

Dadi first argues that there was insufficient evidence to sustain a conspiracy charge.  Under 18 U.S.C. § 371, the government must prove that (1) two or more persons conspired to pursue an unlawful objective; (2) the defendant knew of the unlawful objective and voluntarily agreed to join the conspiracy with the intent to further the objective; and (3) one or more of the members of the conspiracy committed an overt act in furtherance of the objective of the conspiracy.  See United States v. Pettigrew, 77 F.3d 1500, 1519 (5th Cir. 1996); United States v. Campbell, 64 F.3d 967, 975 (5th Cir. 1995).  The government must prove the same degree of criminal intent as is necessary for proof of the underlying substantive offense.  See United States v. Bordelon, 871 F.2d 491, 493-94 (5th Cir.), cert. denied, 493 U.S. 838 (1989).  In Pettigrew, all the evidence

pointing toward the agreement and intent elements of the crime was circumstantial. The court affirmed the conviction because the evidence was such that a rational juror could infer both these elements of the offense. See Pettigrew, 77 F.3d at 1519.

Dadi argues that here there was no evidence of an agreement, citing Mackvandian's testimony that there was no agreement to defraud a bank, and that he was unaware that any of the checks involved in the scheme were counterfeit. Dadi also cites the testimony of Yvette Reyes that she never agreed to defraud a bank. But these disclaimers must be weighed against all the evidence of activity from which an unlawful agreement may be inferred.

The government, of course, contends that the evidence indicating a conspiracy outweighs Mackvandian's and Yvette Reyes' disclaimers. Several pieces of evidence support this argument: for example, Dadi and Khayambashi had a close relationship; Dadi recommended Khayambashi to the Wallis State Bank; Dadi's fingerprints were found on counterfeit checks drawn on Khayambashi's account; and checks drawn on that account were passed through Homa Dadi's account. Dadi assisted Mackvandian and Khayambashi in acquiring bank accounts through which counterfeit checks were later funneled. Mackvandian also admitted at trial that he thought he and Dadi were using other people's money without their knowledge or consent. And Dadi

8

received most of the profits from the transactions involving the counterfeit checks.

In some situations, circumstantial evidence is sufficient to support a finding of fraudulent intent.  See Crowe v. Henry, 115 F.3d 294, 297 (5th Cir. 1997); see also United States v. Ryan, 213 F.3d 347, 350 (7th Cir. 2000) ("Intent to defraud can be proven by circumstantial evidence and by inferences drawn from the scheme itself.").  "Fraudulent intent may be found from circumstantial evidence that one party arranged matters with another party in such a way as would facilitate the commission of fraud, especially where the evidence further shows that the first party gained money or advantage at the expense of the second." Crowe, 115 F.3d at 297.  Viewing the evidence in the light most favorable to the verdict, we find that the circumstantial evidence available in this case is more than sufficient to support an inference that Dadi was guilty of the § 371 conspiracy.

Dadi next argues that there was insufficient evidence to show specific intent to defraud a bank or that he voluntarily participated in an agreement to defraud a bank.  Under 18 U.S.C. § 1344, the government must prove beyond a reasonable doubt that the defendant "knowing[ly] execute[d] or attempt[ed] to execute a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any property owned by, or under the custody or control

9

of, a financial institution, by means of false or fraudulent pretenses, representations or promises." Campbell, 64 F.3d at 975.

The bank fraud charge is premised on the $95,728 check that was deposited in the account of Stella Reyes at the Texas Commerce Bank. Dadi argues that because Mackvandian and Yvette Reyes testified that they never agreed with Dadi to defraud a bank, and because there was no proof that Dadi knew the $95,728 check was counterfeit, there was insufficient evidence of bank fraud. These assertions do nothing to explain what Dadi thought he was doing when he deposited a $95,728 Southern Polymer check he claims he didn't know was counterfeit, into the bank account of a deceased woman, and later withdrew funds from that account. This evidence is sufficient to persuade a reasonable jury of Dadi's guilt.

Dadi also disputes the sufficiency of the evidence to support the aiding and abetting charges. To convict under 18 U.S.C. § 1957, the government must prove that "the defendant 'knowingly engage[d] or attempt[ed] to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity.'" United States v. Dupre, 117 F.3d 810, 821 (5th Cir. 1997) (citing 18 U.S.C. § 1957(a)). To prove that a defendant aided and abetted the commission of a criminal offense, the

10

government must show that the defendant intentionally associated with, and participated in, the criminal venture and acted to make the venture succeed. See United States v. Beuttenmuller, 29 F.3d 973, 981 (5th Cir. 1994).

Most of the counts at issue involve banking transactions by Mackvandian. Because Mackvandian is implicated as a counterfeiter and as a participant in this scheme, Dadi argues that—-to the extent that Mackvandian's testimony implicated Dadi—-Mackvandian's testimony is not credible. This assertion is unavailing on appeal. The credibility of witnesses is a matter for the jury and its determinations demand deference. See United States v. Meshack, 225 F.3d 556, 567 n.6 (5th Cir. 2000).

Dadi also argues that the only evidence against him is his familial relationships with Homa Dadi, Yvette, Yvonne and Stella. However, Dadi is asking this court to ignore persuasive evidence that he assisted others in procuring bank accounts for the purpose of depositing and withdrawing funds from counterfeit checks. The evidence viewed in the light most favorable to the verdict appears to support an inference that the elements of the aiding and abetting charge were present.

### III. The Organizer/Leader Enhancement

This court reviews a district court's finding that a defendant is an organizer or leader for clear error. See United States v. Ronning, 47 F.3d 710, 711 (5th Cir. 1995); United

11

States v. Liu, 960 F.2d 449, 456 (5th Cir. 1992).  As long as the sentencing court's finding on a sentencing factor is plausible in light of the record read as a whole, a factual finding is not clearly erroneous.  See United States v. Valencia, 44 F.3d 269, 272 (5th Cir. 1995).  Absent some evidence of clear error, this court must affirm the district court's finding, "even [if] the district court failed to specifically articulate a factual basis for its determination."  Valencia, 44 F.3d at 273.

The district court concluded that Dadi was an organizer or leader, and therefore added four levels to his base offense level.  Under the Sentencing Guidelines, a court may increase a defendant's conspiracy offense level by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1(a).

Dadi argues that this enhancement is inapplicable because there was no proof that he controlled or influenced anyone involved in the offense.[5]  The PSR recommended the enhancement based, Dadi contends, simply on the fact that Dadi suggested to the others that they commit the offense—-a fact that is not

_____

[5]Dadi cites two cases in which a court of appeals reversed the decision applying the enhancement because there was no proof that the defendant exercised control over the others involved.  United States v. Mustread, 42 F.3d 1097, 1104-05 (7th Cir. 1994); United States v. Sostre, 967 F.2d 728, 733 (1st Cir. 1992).  These cases are in other circuits and are factually distinguishable.

12

sufficient to establish that he exercised control or influence over the others. Even if he was a major participant in the offense, he argues, this is still not enough to justify the enhancement absent some showing of control or influence. See United States v. Castellone, 985 F.2d 21, 26 (1st Cir. 1993); United States v. Sostre, 967 F.2d 728, 733 (1st Cir. 1992); United States v. Litchfield, 959 F.2d 1514, 1522-23 (10th Cir. 1992). We find, however, that the conclusion that Dadi is an organizer or leader is plausible in light of the record.

Dadi also contends that the offense did not involve five or more participants—-another factor required to justify the enhancement. Dadi cites United States v. Maloof, 205 F.3d 819, 830 (5th Cir. 2000), for the proposition that failure to find that each of the people identified was criminally responsible requires reversal of the application of the enhancement. However, Maloof also makes clear that the additional participants need not have been convicted of the offense. See id. Dadi offers nothing to refute the PSR finding that he was an organizer, and that Mackvandian, Yvette Reyes, and Yvonne Reyes, Homa Dadi, Naser Khayambashi and Mike Maharaj were involved in the scheme. While the evidence on the involvement of the latter three is weaker than the evidence of the involvement of Mackvandian and the Reyes sisters, that—-without more—-is

insufficient to support a finding of clear error.[6]

Dadi further argues that he could not have been an organizer or leader because he did not receive a larger share of the profits than the other codefendants. Dadi bases this conclusion on the fact that the total loss was found to be $807,100, and Dadi received only $102,500. That Dadi received "only" $102,500 does little for his argument that he was not an organizer or leader, and he does not advance any argument that another scheme participant received a greater share of the profits.

Given Dadi's weak attacks on the district court finding that he was an organizer or leader, and the wealth of evidence from which such a finding could be inferred, we see no reason to disturb this sentence. It is entirely plausible that--based on the evidence viewed as a whole--a court could conclude that Dadi was an organizer or leader.

### IV. Foreseeability of Loss from the Khayambashi Checks

The district court found that the amount of the loss attributable to Dadi was $807,100. Had the Khayambashi checks been excluded, the total loss attributable to Dadi would have been $95,728. Thus, without the Khayambashi checks, Dadi's base

---

[6]In addition, the Guideline is applicable to schemes involving fewer than five participants if the scheme "was otherwise extensive." U.S.S.G. § 3B1.1(a). The plausibility of the involvement of five or more participants is therefore buttressed by the clear plausibility that a court could find the scheme to be "otherwise extensive."

offense level would have been increased—-at most—-by only one level (instead of four) under the relevant Sentencing Guidelines. See U.S.S.G. §§ 2S1.2(b)(2); 2S1.1(b)(2)(B).[7]

The losses to be considered were attributed to the $53,000 Yazdanpanah check, the $95,728 Southern Polymer check (deposited into Stella Reyes' account) and the forged Gillman checks for $130,000, $77,650, $125,000, $75,750, and $249,972. All these checks were deposited into one of Khayambashi's accounts (Southwest Oil, N&M Petrochemical or his personal account at the Wallis State Bank). Dadi argues that, even if the evidence was sufficient to convict him, the trial court erred in attributing to him the six checks deposited into Khayambashi's accounts.

In order to find a defendant accountable for a co-conspirator's acts, the trial court must expressly find that the acts were reasonably foreseeable to the defendant. See United States v. Evbuomwan, 992 F.2d 70, 74 (5th Cir. 1993) (to hold a defendant accountable for losses arising from a check fraud scheme, the scheme must be within the scope of the conspiracy and the losses must be foreseeable); United States v. Studley, 47 F.3d 569, 574 (2d Cir. 1995) (for a defendant to be sentenced

---

[7]The Guidelines provide for a one-level increase if the loss exceeds $100,000. If it had excluded the Khayambashi checks, the district court may have decided to include other checks attributable to Dadi that it did not consider at sentencing. Dadi concedes that such a calculation could have led to the conclusion that Dadi profited by $102,500 from counterfeit checks totaling $198,728.

15

based on the acts of a co-conspirator, "a district court must make a particularized finding as to whether the activity was foreseeable to the defendant.").

Dadi contends that only the $95,728 check should be attributed to him because the other checks were presented for deposit into Khayambashi's accounts——something not reasonably foreseeable to Dadi. Dadi's contention is based on the thesis that there was no connection between him and Khayambashi aside from the fact that Dadi "allegedly" referred Khayambashi to the Wallis State Bank. The government did not establish, Dadi argues, that there was an agreement between Dadi and Khayambashi, that——even if there were such an agreement——the Khayambashi checks were within the scope of that agreement, or that the checks were reasonably foreseeable to him. But see United States v. Sneed, 63 F.3d 381, 389-90 (5th Cir. 1995)(sufficient evidence of money laundering where the scheme was defendant's idea and defendant profited).

The government argues that the record supports the foreseeability of these losses, citing the facts that (1) Patricia Mackvandian (Mackvandian's wife) issued a $30,000 check payable to Dadi from an account into which Mackvandian deposited a Khayambashi check; (2) the handwriting on a Gillman Properties counterfeit check——deposited into Khayambashi's Wallis State Bank account——resembled that on other checks prepared by Dadi; and (3)

16

the other checks involved Mike Maharaj, the "mysterious" man with whom Dadi dealt in counterfeit checks, according to Mackvandian's testimony. The government notes that a "common denominator" in the transactions involving these checks was Mike Maharaj. Also, the government argues that the trial testimony traces the proceeds of all these checks back to Dadi.

Dadi argues that, because the amount of the loss was not reasonably foreseeable to him, the trial court erred in attributing that amount to him. See United States v. Scurlock, 52 F.3d 531, 539 (5th Cir. 1995) (noting that defendants are only responsible for the amount of loss reasonably foreseeable to them). But there was sufficient evidence that the losses from the Khayambashi checks were foreseeable to Dadi; he received the profits from them and was heavily involved in the entire scheme. We may reverse the factual findings of a trial court only if there is clear error. There is no clear error if a finding is plausible in light of the record as a whole; and, if a monetary loss is involved, the trial court need not determine the amount of the loss with precision. See United States v. Humphrey, 104 F.3d 65, 71 (5th Cir. 1997). We therefore do not see any clear error in the trial court's findings.

### V. Application of the Money Laundering Guideline

Dadi argues that the district court erred in its application of the Sentencing Guidelines by failing to apply the more lenient

17

fraud guidelines instead of the money laundering guideline. Dadi finds his strongest support from United States v. Smith, a Third Circuit opinion in which that court determined that the initial choice of sentencing guideline should be governed by a "heartland" analysis: whether the offense is outside the heartland of the conduct normally punished using a particular guideline. 186 F.3d 290, 297-300 (3d Cir. 1999). Dadi argues that the money laundering guidelines, U.S.S.G. §§ 2S1.1 and 2S1.2, are intended to apply to large scale drug and organized crime enterprises that launder large amounts of money—-not "simple fraud cases." A district court's choice of a Sentencing Guideline is a matter of law, and therefore the decision is subject to de novo review. See Smith, 186 F.3d at 297; see also United States v. Franklin, 148 F.3d 451, 459 (5th Cir. 1998).

Here, the district court was required to group the fraud and money laundering offenses because those crimes involved multiple offenses that were linked by a common illegal objective. See United States v. Leonard, 61 F.3d 1181, 1185 (5th Cir. 1995) (noting that § 3D1.2(d) explicitly provides for grouping of offenses covered by the fraud and money laundering guidelines). Further, the district court properly imposed a sentence under the money laundering guideline, which produced the higher offense level. See id. The district court did not err in this application of the guidelines.

18

Dadi correctly notes that a court is authorized to depart downward if the offense falls outside the "heartland" of the conduct for which a Sentencing Guideline was intended. Dadi argues that departure from money laundering and use of the more lenient fraud guideline as a guide is appropriate here. He cites our decision in United States v. Hemmingson, in which we held that the district court did not err in applying the fraud guideline where the money laundering offenses did not fall within the heartland of the money laundering guideline. 157 F.3d 347, 361-63 (5th Cir. 1998). And in United States v. Bart, a Texas district court used the fraud guideline as a guide for its downward departure from the money laundering guideline. 973 F.Supp. 691, 695-96 (W.D. Tex. 1997). The court determined—-based on the legislative history of the money laundering statutes—-that the guideline was targeted at "large scale drug and organized crime enterprises laundering large amounts of money." 973 F.Supp. at 696. Dadi claims further support from cases in which the money laundering statutes were deemed inapplicable because the money laundering was incidental to the underlying offense; the underlying offense in this case, Dadi asserts, is bank fraud. See United States v. Threadgill, 172 F.3d 357, 377-78 (5th Cir. 1999), cert. denied, 120 S.Ct. 172 (1999); Smith, 186 F.3d at 299.

The cited cases, while interesting, are clearly inapplicable

19

here.  They discuss when a downward departure is <u>permissible</u>, i.e., when a reviewing court will decline to interfere with a district court's decision to depart.  But that invokes an entirely different standard from the one applied when a district court declines to depart downward.  Because the district court here made no mistake about whether it was permitted to depart downward, we leave the sentence intact.

A decision <u>not</u> to depart downward is not subject to review in this circuit.  See <u>Leonard</u>, 61 F.3d at 1185.  In <u>United States v. Powers</u>, 168 F.3d 741 (5th Cir. 1999), this court declined to invalidate a refusal to depart downward absent a district court misunderstanding of the law.  Thus, unless the refusal to depart "is premised upon the [sentencing] court's mistaken assumption that the Guidelines do not permit such a departure," we have no jurisdiction to review the sentence.  <u>Id.</u> at 753 (citing <u>United States v. Palmer</u>, 122 F.3d 215, 222 (5th Cir. 1997)).  Here, there was no such erroneous belief, and therefore the choice not to depart downward is not subject to our review.[8]

---

[8]Even if we were to conclude that the district court misapplied the money laundering guideline, the error would arguably be harmless. If the district court had applied the fraud guideline, the total offense level would have been 23, and Dadi would have been subject to an imprisonment range of 70 to 87 months (which would authorize the 84 months to which he was sentenced).  However, under that analysis we would have to address Dadi's argument that, although his 84-month sentence is within that range (but at the high end), that sentence would have been at the low end of the range the court would apply under the money laundering guidelines.  See <u>United States v. Tello</u>, 9 F.3d 1119, 1131 (5th Cir. 1993).

20

We also note that—-unlike in <u>Smith</u>—-Dadi's case involves violations that fall within the heartland of a violation of § 1957.  In <u>Smith</u>, the defendants were involved in an embezzlement/kickback scheme, for which money laundering was incidental, and for which the money laundering guideline was inappropriate.  186 F.3d at 300.  The defendant in <u>Powers</u> argued against this reasoning—-claiming, like Dadi, that the court should have departed downward because his conduct fell outside the heartland of offenses intended to be the object of the guideline.  168 F.3d at 753.  That argument did not work for Powers, and it does not work here.

### VI.The Failure to Apply the Enhancement

### for an Offense Committed while on Release

The government, in a cross-appeal, asserts that the district court should have adjusted Dadi's offense level under the authority of 18 U.S.C. § 3147, which provides for a sentencing enhancement for offenses committed while on release on another charge.  The Sentencing Guidelines implement this statutory provision through § 2J1.7.  Under that section:

> If an enhancement under 18 U.S.C. § 3147 applies, add 3 levels to the offense level for the offense committed while on release as if this section were a specific offense characteristic contained in the offense guideline for the offense committed while on release.

21

That Dadi committed this offense while on release on another federal charge is not controverted.

First, we address Dadi's argument that the cross-appeal should be dismissed because it was not approved by an appropriate authority. Dadi argues that application of this enhancement is impermissible because the government failed to show that it secured personal approval of the Attorney General, the Solicitor General or a Deputy Solicitor General designated by the Solicitor General for this purpose. Therefore, he argues that we must dismiss the cross-appeal. See United States v. Thibodeaux, 211 F.3d 910 (5th Cir. 2000) (dismissing the government's appeal because the government had failed to brief or include in the record proof that it had received authority to appeal). In Thibodeaux, we held that the government's appeal of a sentence was subject to dismissal, absent evidence that it ever received approval to pursue the appeal. 211 F.3d at 912. Here, the government has provided the required proof as an attachment to its reply brief. Gov. Reply Br. App. B. The fact that the government has now demonstrated the requisite permission cures this defect and we will not dismiss the cross-appeal on these grounds.

The cross-appeal does fail, however, for lack of adequate notice to Dadi that he would be subject to this enhancement. The government concedes that this enhancement can only be imposed

22

after sufficient notice has been given to the defendant by either the government or the court. Notice must be given at the time of the defendant's release from custody in order to be deemed sufficient. The government contends that Dadi was given notice on August 26, 1996, when he was released from custody to await the designation of a facility in which to serve his sentence on another criminal charge. But the government failed to offer any evidence of this. The government also argues that the formal notice it issued on June 23, 1999 was sufficient, because Dadi had the opportunity to object to the enhancement.

But such notice is clearly insufficient. This circuit held in United States v. Onick that failure by the releasing judge to give the defendant notice of the § 3147 enhancement bars the sentencing judge from applying it later. 889 F.2d 1425, 1433-34 (5th Cir. 1989). The government did not file its notice of intent to enhance Dadi's sentence until more than a month after the PSR was initially disclosed to counsel, and 19 days after the deadline for filing objections had passed. There is no support in the record for the belief that Dadi was advised about the possible enhancement when he was sentenced on the previous charge.

The government relies on an Eleventh Circuit case to assert that notice was adequate. In United States v. Bozza, 132 F.3d 659, 661 (11th Cir. 1998), the court concluded that notice of the

23

§ 2J1.7 enhancement did not have to be given prior to the guilty plea.  But in that case, as Dadi correctly points out, the court noted a conflict with this circuit, because we had held that it was error not to inform the defendant of the enhancement prior to his guilty plea.  See id.; United States v. Pierce, 5 F.3d 791, 793-94 (5th Cir. 1993).[9]  More important, the defendant in Bozza had received notice upon release for the prior conviction.  See id. The government can point to nothing in the record to show that Dadi received such notice upon his release.  Therefore, the district court's decision not to apply the enhancement under § 3147 will stand.[10]

### VII.CONCLUSION

---

[9]In Pierce, the error was considered harmless because the sentence actually imposed was less severe than the maximum sentence the defendant would have received without the enhancement.  5 F.3d at 793-94.  Here, the error would not be similarly harmless.

[10]Because application of the enhancement fails for lack of notice, we need not address the issue on which the district court based its decision: that applying both the criminal history points and the enhancement would be impermissible double counting (two upward adjustments for the same conduct).  In United States v. Franklin, however, this court held that "double counting is legitimate where a single act is relevant to two dimensions of the Guideline analysis."  148 F.3d 451, 461-62 (5th Cir. 1998) (quoting United States v. Kings, 981 F.2d 790, 796 (5th Cir. 1993).  As this circuit noted in Kings, "The offense level represents a judgment as to the wrongfulness of a particular act.  The criminal history category principally estimates the likelihood of recidivism."  981 F.2d at 796 (quoting United States v. Campbell, 967 F.2d 20, 24 (2d Cir. 1992).  Thus, the two adjustments were relevant to two different dimensions, and therefore arguably not impermissible double counting.  However, we need not reach this issue today.

24

For the foregoing reasons, we AFFIRM the decision of the district court.