**UNITED STATES of America, Plaintiff,**

v.

**Yechiel BART and Arthur Stewart, Defendants.**

**Criminal No. SA–94–CR–244.**

United States District Court,
W.D. Texas,
San Antonio Division.

Aug. 27, 1997.

Christopher L. Varner, U.S. Dept. of Justice, Fraud Section, Criminal Div., Boston, MA, James A. Baker, U.S. Dept. of Justice, Fraud Section, Criminal Div., Washington, DC, for U.S.

Roy R. Barrera, Sr., Roy R. Barrera, Jr., Nichols & Barrera, P.C., San Antonio, TX, for Arthur Stewart.

Ronald F. Ederer, Reed, Ederer & Moore, P.C., San Antonio, TX, for Yehiel Bart.

*AMENDED SENTENCING ORDER FOLLOWING REMAND FROM THE FIFTH CIRCUIT COURT OF APPEALS*

BIERY, District Judge.

The matters before the Court are the sentences to be imposed on the defendants Yechiel Bart, formerly of Israel and now living in New Jersey and Arthur Stewart, of Hondo, Texas, who were convicted by a jury of non-violent, non-drug related white collar crimes. Since the original judgments of December 1, 1995, two events have occurred necessitating and affecting the amended judgments herein:

1) The Fifth Circuit Court of Appeals correctly observed this Court was overly vague in its reasons for the extremely rare downward departures granted these defendants. *United States v. Bart,* No. 96–50007, op. at 4, 117 F.3d 1416 (5th Cir. May 29, 1997). The Court pleads guilty to brevity and vagueness in its original judgments and offers in mitigation the burgeoning caseload visited upon this and other federal trial courts as a result of continuing federalization of the criminal and civil law. Nevertheless, the Court will set forth in extensive detail its reasons for the sentences imposed.

2) The United States Supreme Court in the *Koon v. United States* decision, —— U.S. ——, ——, 116 S.Ct. 2035, 2045, 135 L.Ed.2d 392 (1996), restored a modicum of discretion to the federal trial bench in rendering just sentences within the spirit of the law as opposed to the hypertechnical "how many angels fit on the head of a pin" approach of those who worship at the altar of the letter of the law.

To seek justice, to address the appellate court's concerns, to apply the discretionary standards delineated in *Koon,* and to cure the insomniac, the arguments and evidence proffered by both sides have been considered and this opinion is delivered as a part of the judgments in this case.

*HISTORICAL ROOTS*

Because of a statistically supported perception of disparity in sentences within the

statutory ranges of punishment and a good faith desire to seek more perfect justice, Congress enacted the federal sentencing guidelines. 18 U.S.C. § 3553(a)(2)(A) to (D) (Sentencing Reform Act of 1984 provides for development of guidelines which further basic goals of criminal punishment: deterrence, incapacitation, just punishment, rehabilitation); *see* United States Sentencing Commission, *Guidelines Manual,* Ch. 1, Pt. A, intro. comment, at 1 (November 1995) Experience shows the overwhelming majority of defendants are in fact sentenced within the guideline ranges and it is a rarity for the federal trial bench, which is after all in the best position to decide, to depart upwardly or downwardly (unless on motion of the government because of substantial assistance). *See* 1995 U.S. Sentencing Comm'n Ann. Rep. table 31, at 90 (Fifth Circuit: 5.1% downward departures).

One might argue inferentially from these numbers, and this author affirmatively believes, the sentencing guideline system works well only slightly less than 100% of the time. But the Judeo–Christian roots spread to our modern law have rejected the Pharisees' view exalting only the letter, unbalanced by the spirit, of the law. If federal courts are to be more than a mere modern version of the Sanhedrin, those roots must necessarily be nourished and nurtured with the water of common sense, society's interests, mercy and a macro, as opposed to micro, view of the purposes of criminal punishment. In the details of the trees of technical rule-making to achieve the admirable goal of avoiding disparities in sentencing, we should not lose sight of the forest of justice. To do otherwise through a rote, computer application of the guideline grid would cause the flavor of justice to become like tasteless store bought tomatoes compared to the summer joy and plumpness of homegrown.

### THE ANALYTICAL TRELLIS FOR DISCRETION IN SENTENCING AFTER KOON

The Fifth Circuit traditionally used the review power given it under the Sentencing Reform Act to reverse downward departures absolutely. Notably, the appellate court changed this practice in 1996 when it affirmed a downward departure in a money laundering case. In *United States v. Walters,* 87 F.3d 663, 664 (5th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 498, 136 L.Ed.2d 390 (1996), an insurance agent and a member of the governing body of a Louisiana parish were convicted by a jury of mail fraud, money laundering and conspiracy for failing to disclose payment of a solicitation fee. The government appealed the agent's twenty-four month sentence for money laundering. *Id.* at 671. The Fifth Circuit found the downward departure reasonable and not disproportionate in the light of the district court's conclusion the guideline calculation overstated the seriousness of the offense. *See id.* at 671–72. Ten days after the Fifth Circuit issued its less restrictive standard regarding downward departure in the *Walters* money laundering case, the United States Supreme Court similarly enlarged the amount of discretion afforded the sentencing judge. *Koon,* —— U.S. at ——, 116 S.Ct. at 2043.

In *Koon,* the Supreme Court created a framework for analyzing when departures may be appropriate. *See* Paul J. Hofer, *Discretion to Depart after Koon v. United States,* 9 Fed. Sent. Rep. 8 (July/August 1996); *see also* Larry Allen Nathans, *Grid & Bear It,* The Champion, July 1997, at 31. A court must inquire into the following matters when considering a downward departure:

* What features of this case potentially take the case outside of the guidelines' heartland and make it a special or unusual case?
* Has the Sentencing Commission forbidden departures based on those features?
* If not, has the Sentencing Commission encouraged departures on those features?
* If not, has the Sentencing Commission discouraged departures based on those features?

*Koon,* —— U.S. at ——, 116 S.Ct. at 2045. To resolve this inquiry, the totality of the circumstances must be considered, including the many facts which bear on the outcome of the case. *Id.* at ——, 116 S.Ct. at 2046. The sentencing court must identify any "special" features of the case which may form the

basis for departure. *See id.* If the guidelines forbid departures based upon a feature, a court cannot grant a departure.[1] If the guidelines encourage departures based upon a special factor, a court may depart if the applicable guideline does not already account for the factor.[2] If the special factor is a discouraged factor[3], or an encouraged factor already taken into account by the guidelines, a court should depart only "if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *Koon,* —— U.S. at ——, 116 S.Ct. at 2045. If the factor is not identified in the guidelines, a court must determine if the factor takes the case outside the heartland. *Id.* The sentencing guidelines allow a court to depart downward from the guideline range if the court finds an aggravating or mitigating circumstance which was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines and which should result in a sentence different than that described. 18 U.S.C. § 3553(b). In determining whether a circumstance was adequately taken into consideration by the Commission, the sentencing judge shall consider the sentencing guidelines, as well as policy statements and official commentary of the Sentencing Commission. *Koon,* —— U.S. at ——, 116 S.Ct. at 2044. This analysis considers the structure and theory of the relevant guideline and the guidelines as a whole. *Id.* at ——, 116 S.Ct. at 2045. Whether a factor is present to a degree not adequately considered by the guidelines, or whether a discouraged factor nonetheless justifies departure because it is present in some unusual or exceptional way, are questions determined in large part by comparison with the facts of other guideline cases. *United States v. Wells,* 101 F.3d 370, 374 (5th Cir.1996). The factors warranting departure in a particular case do not exist in isolation, but may well converge to create the unusual situation not contemplated by the Commission. *United States v. Parham,* 16 F.3d 844, 848 (8th Cir.1994). *Koon* makes clear "[t]he appellate court should not review the departure decision *de novo,* but instead should ask whether the sentencing court abused its discretion." —— U.S. at ——, 116 S.Ct. at 2043.

## THE FRUIT OF THIS COURT'S EXPERIENCE

Recognizing the sentencing judge to have the perspective of seeing the humanity involved in a criminal trial, as opposed to a paper record, the Supreme Court in *Koon* deferred to the sentencing court's discretion based on the experience of judicial trial officers. "To ignore the district court's special competence—about the ordinariness or unusualness of a particular case—would risk depriving the Sentencing Commission of an important source of information, namely, the reactions of the trial judge to the fact-specific circumstances of the case." *Koon,* —— U.S. at ——, 116 S.Ct. at 2047 (citation omitted). Former Commissioner Breyer, writing as Chief Circuit Judge in *United States v. Rivera,* 994 F.2d 942, 951 (1st Cir.1993), emphasized the importance of deferring to the sentencing judge's "superior feel for the case," which, when reduced to writing, "can help the Commission determine whether, and how, Guidelines revision should take place."

In the past three and one-half years, the undersigned has sentenced approximately one thousand (1,000) felony defendants within the guideline ranges. Perhaps two or three dozen defendants received downward departures of a few months because they had served most of their sentences and were

---

1. Departures based upon race, sex, national origin, creed, religion, socio-economic status, U.S.S.G. § 5H1.10; lack of guidance as a youth, U.S.S.G. § 5H1.12; drug or alcohol dependence, U.S.S.G. § 5H1.4; and economic hardship U.S.S.G. § SK2.12; are forbidden.

2. The guidelines list a number of factors which encourage a downward departure including: (1) no intent to injure or kill, U.S.S.G. §§ 5K2.1, 5K2.2(2); (2) victim's wrongful conduct signifi-

cantly provoked the offense, U.S.S.G. § 5K2.10; (3) offense committed to avoid perceived greater harm, U.S.S.G. § 5K2.11; (4) coercion or duress, even if insufficient to constitute a complete defense, U.S.S.G. § SK2.12; and (4) diminished capacity not resulting from the use of intoxicants, U.S.S.G. § 5K2.13.

3. Discouraged factors include the defendant's family ties and responsibilities, U.S.S.G. § 5H1.6; his or her education and vocational skills, U.S.S.G. § 5H1.2; and his or her military,

subject to imminent deportation to their home countries, thus obviating the need for American taxpayers to house and feed them further and making jail space available for new arrestees. This case is the only instance in which a downward departure of this degree has been granted in this Court's federal experience. Moreover, for over fifteen years prior to 1994, the undersigned sentenced and reviewed the punishments of thousands of misdemeanor and felony defendants in Texas trial and appellate courts. Accordingly, the punishment decision reached herein is one neither lightly reached nor without a significant experiential base of other cases.

### SEEDS OF THE CONTROVERSY

Mr. Stewart and Mr. Bart were accused of offenses resulting from the sale of aircraft parts to the Israeli armed forces. The Israeli Ministry of Defense Mission to the United States ("MODNY") is an arm the Israeli government military defense team. Mr. Bart was one of approximately 225 individuals who worked as a buyer for MODNY, primarily procuring weapons and support items for the Israeli armed forces. One of the companies from which Mr. Bart made purchases, Gary Aerospace, was owned by the Stewart family and run by Mr. Stewart. Gary Aerospace, located in Hondo, Texas, was a privately held company engaged in the repair and refitting of aircraft engines.

Although the defendants together were acquitted on a total of thirty counts of criminal activity, a jury found defendants used their professional and managerial discretion to obtain monies fraudulently through manipulation of the purchase orders relating to the Israeli military program. Mr. Stewart and Mr. Bart were convicted of fraud, in violation of 18 U.S.C. § 1341; wire fraud, in violation of 18 U.S.C. § 1343; interstate transportation of property taken by fraud, in violation of 18 U.S.C. § 2314; and of engaging in

monetary transactions in property derived from specified unlawful activity, or money laundering, in violation of 18 U.S.C. § 1957. Because these offenses are closely related, U.S.S.G. § 3D1.2 groups them together for purposes of sentencing and provides the greatest base offense level for any of the grouped offenses should be used for sentencing. Here, the base level for money laundering under U.S.S.G. § 2S1.2 was the greatest. As outlined in the presentence investigation report, the Court found there is sufficient evidence to determine a reasonable estimate of the loss, given the available information, is $76,000. Mr. Bart has paid his share ($36,-528) of restitution and has paid the $650 special assessment fee. Mr. Bart and Mr. Stewart are viewed as the only individuals who directly profited from their fraudulent activities and no offense was committed by a criminal organization.

### THE INTERTWINED VINES OF MR. STEWART AND MR. BART

■ The Court first addresses factors common to Mr. Stewart and Mr. Bart:

1) To determine whether a case falls outside the heartland, a court may inquire what type of case a particular guideline is intended to cover. Paul J. Hofer, *Discretion to Depart after Koon v. United States*, 9 FED. SENT. REP. 10 (July/August 1996). This inquiry focuses on the legislative history and guideline commentary surrounding the particular offense, in this case, the money laundering statutes. *Id.; see also Koon*, —— U.S. at ——–——, 116 S.Ct. at 2044–46.

Congress enacted the money laundering statutes, 18 U.S.C. §§ 1956 and 1957, as part of the Anti–Drug Abuse Act of 1986. Debates surrounding their passage reveal the money laundering statutes were intended to combat the large amounts of money being "laundered" by the drug trade and organized crime.[4] Moreover, although the statute cov-

---

civic, charitable or public service record, U.S.S.G. § 5H1.11.

**4.** In introducing this legislation, Senator Thurmond, Chairman of the Judiciary Committee, remarked "[c]reation of a money laundering offense is imperative if our law enforcement agencies are to be effective against the organized criminal groups which reap profits ... by cam-

ouflaging the proceeds through elaborate laundering schemes." *Statements on Introduced Bills and Joint Resolutions, 1986: Proceedings and Debates on the Money Laundering Crimes Act*, 99th Cong., 2d Sess. (Thursday, July 24, 1986), *available in* WESTLAW, 132 C.R. S9626–04. Senator Biden, also a chief sponsor of the bill, recognized that "[m]oney laundering is a crucial financial underpinning of organized crime and narcotics trafficking." *Id.* Senator DeConcini observed the

ers many types of underlying conduct, commentators agree money laundering has been traditionally associated with large drug enterprises. *See United States v. Ferrouillet,* No.Crim. A. 96–198, 1997 WL 266627, at *5 (E.D.La. May 20, 1997) (quoting extensively from Senate hearings and related commentary). As to the structure of the relevant money laundering guideline, the commentary to U.S.S.G. § 2S1.2 states the legislative history of 18 U.S.C. § 1957 influenced the drafting of the guideline: "In keeping with the intent of the legislation, this guideline provides for substantial punishment." U.S.S.G. § 2S1.2, comment (background), at 207. "It is apparent, therefore, that the money laundering guideline was set at a relatively severe base offense level to counteract the illegal drug trade in this country." *United States v. Caba,* 911 F.Supp. 630, 635 (E.D.N.Y.1996), *aff'd,* 104 F.3d 354 (2d Cir. 1996). At least one district court in this circuit agrees. *Ferrouillet,* 1997 WL 266627, at *6 (adopting reasoning of *Caba* decision).

A 1992 memorandum written by the Sentencing Commission's Money Laundering Working Group reinforces this view: "[I]t appears that the base offense levels ... reflect a view that [the money laundering statutes] would generally be applied primarily to traditional, and perhaps large-scale, professional money launderers." U.S. SENTENCING COMM'N, MONEY LAUNDERING WORKING GROUP, REP. ON INFORMATION GATHERING AND INITIAL FINDINGS 17 (October 14, 1992). The working group proposed amendments which would have required that the money laundering base offense levels correlate more closely with the offense levels applicable to the underlying conduct. *See id.* at 20; *see also* Act of October 30, 1995, Pub.L. No. 104–38, 1995 U.S.C.C.A.N. (109 Stat.) 335, 344 (proposed amendments submitted to Congress by Sentencing Commission on May 1, 1995). Although Congress ultimately rejected these arguments, the memorandum and proposed amendments are evidence of the Commission's concern the money laundering statutes were being unequally applied to dissimilar criminal offenses and dissimilar offenders. *See* 1995 U.S.C.C.A.N. (109 Stat.) 344 (disapproving proposed amendments).

Additional indicia these guidelines were intended for large scale criminal operations involving sizeable amounts of money is found in the structure of the money laundering guidelines. The lowest base offense level of guideline § 2S1.2 starts at a sizeable $100,000. The base offense level increases only when the value of funds increases to $200,000, and then $350,000, $600,000, $1,000,000 and $2,000,000 and greater. Given that the initial offense level does not differentiate between funds less than $100,000, and the severity of the sentence increases only when the value of the funds increases by $100,000 or more, it appears the Commission targeted large scale operations when drafting the money laundering guidelines.

The legislative history, the Sentencing Commission's commentary to U.S.S.G. § 2S1.2, the memorandum and proposed amendments of the working group, as well as the structure of the guidelines themselves, support the conclusion the money laundering guidelines are intended to apply to large scale drug and organized crime enterprises laundering large amounts of money. This case does not involve any drug or organized crime enterprise and the amount of so-called laundered money was $76,000, a sum falling within the lowest base offense level of the guideline. Mr. Stewart and Mr. Bart are neither drug dealers nor organized crime members, nor were they involved in a massive money laundering operation. Rather, their schemes consisted of a businessman and a non-practicing lawyer defrauding the

money laundering laws are necessary to prevent large legitimate businesses, organized crime and drug kingpins from concealing enormous amounts of illegally generated income. *Statements on Introduced Bills and Joint Resolutions, 1985: Proceedings and Debates on the Money Laundering Crimes and Disclosure Act,* 99th Cong., 1st *Sess.* (Thursday, June 27, 1985), *available in* WESTLAW, 131 C.R. § 8957-02. After

analyzing reports related to the Anti–Drug Abuse Act, the Tenth Circuit Court of Appeals concluded the purpose behind 18 U.S.C. § 1957 was to criminalize the "classic case" of laundering money "where a drug trafficker collects large amounts of cash from drug sales...." *United States v. Johnson,* 971 F.2d 562, 568 (10th Cir. 1992).

government of an amount on the lowest downward side of the prohibited value of funds.

In its resentencing brief, the government cites examples of pre-*Koon* cases where the defendants were sentenced under the money laundering guidelines for non-narcotic activities. At least two circuit courts have held that *Koon* provides an opportunity for revisiting downward departure issues decided in the government's favor prior to *Koon*. In *United States v. Brock*, 108 F.3d 31 (4th Cir.1997), and *United States v. Kalb*, 105 F.3d 426 (8th Cir.1997), the Fourth and Eighth circuits considered downward departure issues which, under existing pre-*Koon* precedent, had been deemed improper grounds for downward departures. In each case, the appellate court concluded *Koon* had implicitly overruled existing precedent, requiring that the relevant departure issues be reconsidered. *Brock*, 108 F.3d at 35; *Kalb*, 105 F.3d at 428–29. Hence, both *Brock* and *Kalb* provide authority for concluding any case decided prior to *Koon*, which addressed a factor the Guidelines do not expressly prohibit as a basis for departure and held the factor could never justify downward departure, must be reconsidered in light of *Koon*. *See* Larry Allen Nathans, *Grid & Bear It*, THE CHAMPION, July 1997, at 49; *see also Sentencing Guidelines*, A.B.A. SEC. CRIM. JUST. NEWSL. (WHITE COLLAR CRIME COMMITTEE), July 1997, at 11–12.

Another consideration of the heartland analysis is the type, or profile, of the defendant typically prosecuted under the statute. Paul J. Hofer, *Discretion to Depart after Koon v. United States*, 9 FED. SENT. REP. 10 (July/August 1996). This profile reflects an examination of prosecutorial practices and the types of crimes prosecuted in federal courts. The vast majority of money laundering convictions nationwide result from pleas of guilty and a full 16.4% of those convicted receive fully probated sentences. U.S. Sentencing Comm'n, *MONFY*, tables 3, 4 (Datafile 1995). The United States Attorney's Manual, the United States Government Manual and Department of Justice ("DOJ") news releases are other indicators of the usual or ordinary type of money laundering defendant. These publications are probative of how the government views the intentions of Congress in drafting the statutes and the Commission in drafting the guidelines and also are instructive as to how the government believes the statutes should be applied.

The DOJ United States Attorney's Manual provides the money laundering section of the United States Attorney's Office was created to prosecute money laundering cases and that only particularly complex and sensitive cases should be prosecuted under 18 U.S.C. § 1957. U.S. DEP'T OF JUST., U.S. ATTY'S MANUAL, ORG. OF THE CRIM. DIV. 9–3.400. This is, the government manual states, to ensure uniform application of the money laundering statutes. U.S. DEP'T OF JUST., U.S. GOV'T MANUAL 335, 341 (1996/1997). Moreover, within the last five years, the DOJ altered its internal policy for charging money laundering counts in financial cases such as this. The policy, effective only since the fall of 1992, mandates "[i]n any case where the conduct to be charged as 'specified unlawful activity' under §§ 1956 and 1957 consists primarily of one or more financial or fraud offenses, and where the financial and money laundering offenses are so closely connected with each other that there is no clear delineation between the underlying financial crime and the money laundering offense, no indictment or complaint may be filed without prior consultation with the Money Laundering Section." U.S. DEP'T OF JUST., U.S. ATTY'S MANUAL, CRIM. DIV. (MONEY LAUNDERING BLUESHEET) 9–105.000, at B3. This new policy advises prosecutors that where the same financial transaction is the basis for the specified unlawful activity and the laundering charge, no money laundering charge should be brought. *Id.* Although the Court does not contend it has the authority to enforce on behalf of the defendants internal policies of the DOJ, the Department's recognition of this problem further supports the conclusion this case presents a situation not adequately considered by the Sentencing Commission in formulating the guidelines.

DOJ news releases focus on the success the government has had in prosecuting large scale money laundering operations. See U.S. DEPT. OF JUST., NEWS RELEASE, MIAMI FEDERAL GRAND JURY INDICTS FOUR IN MULTI-

MILLION DOLLAR "FREON" EXCISE TAX FRAUD CASE, 1996 WL 499535 (September 5, 1996); U.S. DEP'T OF JUST., NEWS RELEASE, HUNDREDS OF VICTIMS OF AN ADA BUSINESS SCAM GET MONEY BACK, 1996 WL 355649 (June 28, 1996); U.S. DEP'T OF JUST., NEWS RELEASE, FORMER ORGANIZED CRIME FIGURE SENTENCED IN BILLION DOLLAR FUEL TAX FRAUD SCHEME, 1996 WL 307912 (June 7, 1996).

Given these government pronouncements, the decision to prosecute Mr. Stewart and Mr. Bart under the money laundering statute appears to deviate from prosecutorial practices and may controvert not only the government manual, but also two objectives of the Commission, uniformity and proportionality in sentencing. USSG Ch. 1, Pt. A, intro. comment, at 2. This prosecutorial discretion provides the government with the ability to seek disparate sentences in spite of similar criminal offenses committed by similar offenders. Moreover, this case was prosecuted by the fraud section of the United States Attorney's Office rather than the section created and designated to prosecute money laundering crimes. By commenting on the government's charging choices, no suggestion is made the government did not have the authority to indict under the money laundering statute, only that the case is atypical given the DOJ's stated procedures regarding money laundering offenses. The Court finds the guidelines do not take these government charging choices into account. See Koon, —— U.S. at ——, 116 S.Ct. at 2044.

2) If a case has features which would result in irrationality if the guideline sentence was applied, the case is outside the normative heartland and departure is warranted. Paul J. Hofer, *Discretion to Depart after Koon v. United States,* 9 FED. SENT. REP. 11 (July/August 1996). Punishment and sentencing goals are set forth in Title 18 U.S.C. § 3553. The sentence to be fashioned must reflect the seriousness of the offense, promote respect for the law and provide just punishment for the particular offense. 18 U.S.C. § 3553. Adequate deterrence to criminal conduct must be afforded and the public must be protected from other crimes of the offenders, while defendants must be

provided with needed educational or vocational training or other correctional treatment. *Id.* The ideal of equal justice under the law requires appropriate punishment of both white-collar and street crimes. *See id.* While the sentencing guideline system seeks consistency, a sentencing judge is not required to be blind to common sense and fundamental fairness, nor do the guidelines place a court in a sentencing straightjacket in fashioning appropriate punishment. *See Koon,* —— U.S. at ——, 116 S.Ct. at 2047. Applying the guidelines to the individual circumstances of each defendant is "heavily dependant ... on the application of the fact-finding tribunal's experience with the mainsprings of human conduct." *United States v. Wright,* 873 F.2d 437, 444 (1st Cir. 1989) (citation omitted).

Recognizing that punishment in a criminal case must be based on its own peculiar facts, it nevertheless seems at least a bit ironic, if not logically absurd, that law enforcement officer Koon could beat his victim Rodney King almost to the point of death, have his sentence of thirty (30) months given the imprimatur of approval by the United States Supreme Court and yet have the same government, albeit represented by different counsel, insist these non-violent defendants are deserving of almost twice as much punishment as officer Koon. Such a disparity runs afoul of the goal of achieving a perception of fairness and consistency in sentencing. *See* U.S.S.G. Ch. 1, Pt. A, intro. comment, at 2.

3) One of the underlying public policy goals of the Sentencing Guidelines is to ensure consistency among the various districts in the United States. *See id.* Axiomatically, there should be some degree of punishment consistency within this district of the federal court system.

As if spinning a roulette wheel to choose those who would be the money changers in the temple, these defendants were prosecuted, not by the United States Attorney for the Western District of Texas where at least part of the criminal activity occurred, but rather by attorneys from the Fraud Division of the United States Justice Department from Washington, D.C. There being an honest

and good faith disagreement among the advocates for the government and defense, this Court as umpire must resolve those differences to try to achieve some consistency in sentencing within this district and as compared to other related cases involving Israeli officials and American businesses. Although the disagreement has been presented agreeably and noting the reality of prosecutorial discretion, the Court nevertheless divines no reason why defendants prosecuted by Washington lawyers should receive harsher sentences than defendants prosecuted by Western District of Texas lawyers, contrary to the spirit of the guideline concept to prevent disparities in punishment. *See id.* Just as cases prosecuted in different circuits should produce similar sentences, so also similar cases, such as the Israeli/American matters discussed below, prosecuted by different lawyers from the same government should achieve the perception, if not the perfection, of equal justice. The Court finds no indication this factor has been considered by the Sentencing Commission. *See Koon,* —— U.S. at ——, 116 S.Ct. at 2044.

In addition to the earlier comparison with the punishment in *Koon,* this Court's awareness provides additional examples:

A) Western District of Texas prosecutions for white-collar offenses:

1) *United States v. Ronald Barrick,* Criminal Action No. A–94–CR–10 (W.D.Tex.1994), lawyer Barrick guilty of conspiring to defraud and making false, fraudulent, fictitious claims: victim impact loss of $24,228,574.53, total offense level of 30; guideline range of 63–78 months; following a trial, defendant was sentenced to 60 months in prison and ordered to pay $1,804,879.99 in restitution;

2) *United States v. Benefax Surety Corp.,* Criminal Action No. SA–93–CR–278 (W.D.Tex.1993), defendant guilty of conspiring to defraud and making false claims: victim impact loss of $24,228,574.53, total offense level of 24; following a trial, defendant was ordered to pay $1,804,879.99 in restitution;

3) *United States v. Anthony Michael Upton,* Criminal Action No. A–94–CR–10 (W.D.Tex.1994), contractor guilty of conspiracy to defraud the government and making false, fictitious and fraudulent claims: victim impact loss of $365,109.38, total offense level of 17, guideline range of 24–30 months; following a trial, defendant was sentenced to 24 months in prison and ordered to pay $363,813.69 in restitution;

4) *United States v. Earl Stenger,* Criminal Action No. SA–94–CR–322 (W.D.Tex.1994), psychiatrist guilty of subscribing a false income tax return: victim impact loss of $200,000, total offense level of 16, guideline range of 21–27 months; following a plea of guilty, defendant was sentenced to 21 months in prison, fined $50,000 and ordered to pay $200,000 in restitution;

5) *United States v. Charles T. Conway,* Criminal Action No. SA–92–CR–184 (W.D.Tex.1992), lawyer guilty of income tax evasion and structuring of currency to evade reporting requirements: victim impact loss of $46,199.87, total offense level of 13, guideline range of 12–18 months; following a trial, defendant was sentenced to 14 months in prison;

6) *United States v. Lloyd Adams,* Criminal Action No. SA–94–CR–344 (W.D.Tex.1994), defendant guilty of conspiring to steal government property: victim impact loss of $231,718.38, total offense level of 13, guideline range of 12–18 months; following a plea of guilty, defendant was sentenced to 12 months in prison and ordered to pay $200,000 in restitution;

7) *United States v. Clinton Manges,* Criminal Action No. SA–94–CR–319 (W.D.Tex.1994), defendant guilty of conspiring to defraud and bribery: victim impact loss of $67,634.67, total offense level of 18, guideline range of 27–33 months; following a trial, de-

fendant was sentenced to 27 months in prison and fined $50,000;

8) *United States v. Rupert Hayes,* Criminal Action No. SA–93–CR–62 (W.D.Tex.1994), bank president guilty of conspiring to defraud and bribery: victim impact loss of $45,067,826, total offense level of 21, guideline range of 37–46 months; following a plea of guilty, defendant was sentenced to 41 months in prison, fined $25,000 and ordered to pay $43,267,826 in restitution;

9) *United States v. Raul Guerra,* Criminal Action No. SA–93–CR–136 (W.D.Tex.1993), attorney guilty of disposition of a firearm to a person reasonably believed to be a felon: total offense level of 12, guideline range of 10–16 months; following a plea of guilty, defendant was sentenced to 23 months in prison;

10) *United States v. Albert Bustamante,* Criminal Action No. SA–93–CR–39 (W.D.Tex.1993), United States Congressman guilty of racketeering and receipt of a gratuity by a public official: total offense level of 21, guideline range of 36–47 months; following a trial, defendant was sentenced to 42 months in prison and fined $55,000.

B) Related Israeli/American cases prosecuted by government lawyers other than those who prosecuted these defendants: .

1) *United States v. Benjamin Sonnenschein,* defendant guilty of failing to declare currency and failing to report a financial interest in a foreign bank account on his United States individual income tax return: total offense level of 13, guideline range of 12–18 months; following a plea of guilty, defendant was sentenced to 3 years probation, fined $150,000, ordered to pay $50,000 in restitution and to make an additional payment of $2,800,000;

2) *United States v. Herbert B. Steindler,* General Electric's international sales manager guilty of conspiring to commit offenses against the United States, wire fraud, money laundering and use of mail in aid of racketeering: total offense level of 28, guideline range of 78–97 months; after a plea of guilty, defendant was sentenced to 84 months in prison and $1,741,453 was ordered forfeited;

3) *United States v. Gary S. Klein,* defendant guilty of conspiring to commit offenses against the government: total offense level of 20, guideline range of 33–42 months: following a plea of guilty, defendant was sentenced to 18 months in prison and $652,613 was ordered forfeited;

4) *United States v. General Elec. Corp.,* defendant guilty of violating the record keeping provisions of the Foreign Corrupt Practices Act and money laundering: following a plea of guilty, defendant was fined $9,500,000 and entered into a civil settlement of $59,-500,000;

5) *United States v. National Airmotive Corp.,* defendant guilty of submitting false claims: following a plea of guilty, defendant was fined $1,250,-000, entered into a civil settlement in the amount of $1,750,000 and voluntarily returned $400,000.[5]

Lastly, this Court had the experience of sentencing, pursuant to a plea agreement in a case prosecuted by the United States Attorney's Office for the Western District of Texas, Mr. Karlton Halbert, Criminal Action No. SA–95–CR–11 (W.D.Tex.1995). Mr. Halbert was indicted for four armed bank robberies which struck terror into the hearts of four young tellers. Having pleaded guilty to one count, defendant Halbert was sentenced within the guideline range to fifty-one months, a punishment similar to that Washington counsel would have the Court impose on these non-violent defendants.

---

**5.** Though the Court has considered the cases cited by the government, the Court finds them factually inapposite and finds the cases summarized above to be more comparable.

The amount of money stolen, as indicated by the victim impact loss and solidified by the amount of fines, restitutions and civil settlements ordered, and the sentences received in the related Israeli/American and white-collar prosecutions in the Western District of Texas reflect far more serious cases than the one before the Court. For example, the General Electric Corporation was fined $9.5 million and paid a civil settlement of $59.5 million. Its international sales manager caused a victim impact loss of over $11.5 million (an amount 150 times more than that involved in this case) and was ordered to spend eighty-four months in prison. Mr. Hayes, a bank president, caused a victim impact loss of over $45 million and was ordered to spend only forty-one months in prison. The victim impact loss in defendant Klein's case amounted to over $7 million, yet he was sentenced to eighteen months. Here, although the loss was limited to $76,000, the government nonetheless seeks to imprison these defendants for periods comparable to or in excess of the sentences received by more serious offenders. Benjamin Sonnenschein caused $2,800,000 in loss (thirty-seven times the amount involved here) but received probation in a plea agreement negotiated by different government lawyers. In comparison, Mr. Bart and Mr. Stewart are the smallest of fish who absconded with relatively few loaves, notwithstanding government efforts to multiply defendants' size and the severity of their sentences.

4) Many defendants receive downward departures on motion of the government for cooperation with law enforcement officials in ongoing investigations. See 1995 U.S. SENTENCING COMM'N ANN. REP. table 31, at 90 (Fifth Circuit: 19.1% received substantial assistance downward departure). If a defendant is a large corporation such as the General Electric example, it can buy peace with a multi-million dollar payment. But the dwarf tomato variety of defendants who are prosecuted at the end of an investigation or who are so low on the vine they have no information to be harvested have no such opportunity. Mr. Stewart from Hondo, Texas, and Mr. Bart in the low echelon of the Israeli purchasing process clearly are not high on the trellis. This reality, in the Court's opinion, is one of the more identifiable failings of the sentencing guidelines. Often, the only offenders who can take advantage of this type of sentencing relief are the hard-core defendants who have worked their way up in a criminal enterprise to become trusted lieutenants. Only they are in possession of the type and quality of information which can result in arrests and prosecutions, so only they can take advantage of downward departures under this section of the guidelines. In a sense, a person is rewarded for being more involved in a criminal enterprise or activity— for being more of a criminal. It is "curiouser and curiouser" that Mr. Stewart and Mr. Bart could actually receive a lower sentence if they were high up in an organization, had laundered more money or had been in positions of authority. LEWIS CARROLL, ALICE'S ADVENTURES IN WONDERLAND AND THROUGH THE LOOKING GLASS 26 (Penguin Books 1960). The Court finds no evidence this factor has been considered by the Sentencing Commission. *See Koon*, —— U.S. at ——, 116 S.Ct. at 2044.

5) Neither Mr. Bart nor Mr. Stewart appears to be dangerous, *United States v. One Star*, 9 F.3d 60, 61 (8th Cir.1993), and neither has demonstrated he poses any threat to the community, *United States v. Gaskill*, 991 F.2d 82, 86 (3d Cir.1993).

### MR. STEWART'S FACTORS

In addition to the factors common with Mr. Bart, other factors are specific to Mr. Stewart:

1) He was also prosecuted by the same Washington counsel and initially convicted by a jury of conspiracy to defraud the United States, mail fraud and wire fraud in Criminal Action No. SA–95–CR–78, before the Honorable Edward C. Prado. A sentence of thirty-seven months was imposed to run concurrently with the sentence in this case. After serving twenty-one and one-half months, this multiple prosecution was recently reversed and remanded for dismissal by the Fifth Circuit Court of Appeals based on insufficient evidence, although his co-defendants' convictions were affirmed. *United States v. JLM Aviation Int'l*, 122 F.3d 1066 (5th Cir.

1997). Thus, Mr. Stewart has already served the sentence imposed herein, has been put through the rigors of a second trial found by the Fifth Circuit to have been insufficiently presented, and is trying to rebuild his life. *See Koon*, — U.S. at ——, 116 S.Ct. at 2053 (district court may consider effect of successive prosecutions when considering downward departure). He is on supervised release for the next three years in the unlikely event of further violations.

2) After the initial indictment in this case, Mr. Stewart and his counsel met with government counsel and agents to provide information and to engage in good faith negotiations aimed at a non-trial disposition, as often happens in cases presented by government counsel located in the Western District of Texas milieu. In this instance, however, the voluntary meeting resulted in a superseding indictment sought by Washington government counsel alleging additional counts.

3) After many months of incarceration, Mr. Stewart appeared in court for his resentencing following remand from the Fifth Circuit. *Bart*, No. 96–50007, 117 F.3d 1416. He appeared to this sentencing judge to have lost thirty to forty pounds (a fact confirmed by Mr. Stewart), to be pale and to be broken in spirit, thus furthering this Court's belief that sufficient punishment has already been meted out.

4) Mr. Stewart was found to have violated a position of trust, adding two points to the base offense level. In reality, his position was inherited from the efforts of his mother and late father. As a practical matter, the lone individual who could possibly suffer from Mr. Stewart's violation of trust is the woman who bore him. His mother has been at every court proceeding and has never indicated a desire to have her son punished as a result of any monetary loss she suffered from his business dealings. Mainly through the undoing of Mr. Stewart, these business interests are now either defunct or bankrupt and the family fortune is gone. Unlike a violation of trust by an officer of a publicly held company, this situation is clearly intra-family, a difference not adequately taken into account by the Sentencing Commission. *See Koon*, — U.S. at ——, 116 S. Ct. at 2044.

*FACTORS SPECIFIC TO MR. BART*

In addition to the factors in common with Mr. Stewart, other factors are specific to Mr. Bart:

1) Born and reared in Israel, Mr. Bart is an Israeli law school graduate who advanced to Lieutenant Colonel in the Israeli military. He married an American citizen, become a naturalized United States citizen, and has absolutely stated his intent to remain in the United States. Mr. Bart was almost fifty years old when he began his prison sentence. At about the same time, his only son was born. During his incarceration, he kept in daily contact with his wife and infant child.

2) From the very beginning of this case, Mr. Bart has appeared promptly, respectfully and voluntarily at each court proceeding, with no negative reports from pretrial services for the lengthy period between arraignment and voluntarily reporting to the Bureau of Prisons. After being a model prisoner who fully paid his $36,528 restitution and after being separated from his wife and young child for fifteen months, Mr. Bart returned to his family and continued to comply faithfully with his conditions of release, which will continue for three years. Upon reversal of this Court's first sentencing decision and notwithstanding a dearth of evidence that Mr. Bart would flee when he had had every opportunity to do so before, government counsel engaged in *ex parte* communications with Bureau of Prison officials, under whose supervision Mr. Bart remained. As a result, with not even a courtesy advisory to the Court or defense counsel, much less due process notice and an opportunity to be heard by the independent judiciary, the executive branch of the government unilaterally reincarcerated Mr. Bart. The government's methodology imposed further punishment on Mr. Bart not considered by the Sentencing Commission. *See Koon*, — U.S. at ——, 116 S.Ct. at 2044; *see also Parham*, 16 F.3d at 848 (district court may consider government's conduct in decision to grant downward departure). The scene of what happened to Mr. Bart and his family as a result of the government's *ex parte* behavior was

described in a letter to defense counsel from Mr. Bart's wife [6]:

> The last ten days have been a nightmare. Last Thursday morning, two federal marshalls [sic] came and took Yechiel from our house. The local police were in the background with rifles and dogs. They would not let him kiss [his toddler-aged son] without handcuffs on.
>
> Three years ago, almost to the day, this nightmare began. At that time, I was in my ninth month of pregnancy and federal marshalls [sic] came and arrested Yechiel because then, as now the federal prosecutor claimed that Yechiel was a flight risk. He was as much a flight risk then, as he is now. At that time he was attending birthing classes with me and was preparing to be my coach during the birth of our son. Luckily, he was able to return home in time for his son's birth. Since that morning three years ago I have had nightmares and I tremble every time a strange car pulls up to our drive. Last Thursday morning the stormtroopers returned to take my husband again.

> .     .     .     .     .

> Yechiel was out on bond before and after his sentencing until the day he self-surrendered and entered Fort Dix. At Fort Dix he worked outside the gates and was given early release to a halfway house. He traveled on his own from Fort Dix to the halfway house and after being there a short time he was given home confinement. And he is a flight risk?
>
> When Yechiel was picked up [on] Thursday ... he was taken to ... a maximum security facility. He was held in a cell for 23 and a half hours a day.... He was not allowed to have pencil and paper in order to prepare information for his lawyer, for his resentencing....
>
> It seems to me that the prosecutor is succeeding in punishing us, by manipulating the system. What he couldn't accomplish through the courts, he is accomplishing by stretching his reach and misusing the system.

While our adversarial system needs earnest and vigorous prosecutorial efforts, government lawyers also have a duty well described by Mr. Justice Sutherland and a unanimous Supreme Court sixty-two years ago:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.

*Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). Moreover, the United States Attorney's Manual advises government attorneys:

> [The] Principles of Federal Prosecution ... should promote the reasoned exercise of prosecutorial authority, and contribute to the fair, evenhanded administration of the federal criminal laws. The manner in which federal prosecutors exercise their decision-making authority has far-reaching implications, both in terms of justice and effectiveness in law enforcement and in terms of the consequences for individual citizens.... The intent is to assure regularity without regimentation, to prevent unwarranted disparity without sacrificing necessary flexibility. The availability of this statement of Principles to federal law enforcement officials and to the public serves two important purposes: ensuring the fair and effective exercise of prosecutorial responsibility by attorneys for the government, and promoting confidence on the part of the public and individual defendants that important prosecutorial decisions will be made rationally and objectively on the merits of each case.

U.S. DEP'T OF JUST., U.S. ATTY'S MANUAL, PRINCIPLES OF FED. PROSECUTION 9–27.001. As Attorney General Janet Reno has said: "We must treat the people we deal with in every

---

6. In *United States v. Wells*, 101 F.3d 370, 373–74 (5th Cir.1996), the Fifth Circuit affirmed a departure based upon the psychological harm suffered by the victims of defendant's credit card fraud scheme. The sentencing judge found the case involved "extreme circumstances," as described in two letters received from the victims. *Id.* at 372.

context of our service as if that person is a member of our family...." U.S. DEP'T OF JUST., LEGAL ACTIVITIES 1997–1998 iii (1997). Presumably, "every context" includes those against whom the might of the federal government is aimed.

Although never justified, the growth of mischievous mental machinations of those who would employ violence against federal employees and federal property is fertilized and cultivated by the Zealot-like use of government power. That we might not reap what a few would sow, such force must be circumscribed by concepts of fundamental fairness and constitutional due process. ·

Reminiscent of a Shakespearean protest[7], the government complains of the use of the term *"ex parte"* to describe secret communications between government counsel and Bureau of Prison personnel resulting in Mr. Bart's unjustified placement in virtual solitary confinement. Demurring to the government's technically correct semantic analysis, perhaps a vernacular portrayal more clearly construes the government's conduct: The government went behind the Court's back to accomplish its intended purpose.[8]

As required by *Koon*, the Court has considered the structure and theory of the relevant guideline and the guidelines as a whole to determine whether this case falls outside the guideline's heartland. *Koon*, —— U.S. at ——, 116 S.Ct. at 2045. The Court believes each of the factors discussed above is sufficient to take this case outside the heartland. However, the Commission does not preclude a downward departure based upon the totality of circumstances or a combination of characteristics. *See* USSG § 5K2.0 comment, at 311 (November 1995). It is therefore alternatively concluded that the combination of the legislative history, the guidelines' commentary, the structure of the guidelines, government publications, prosecutorial practices (including the rearrest of Mr. Bart), the types of crimes prosecuted, statistical evidence, and past sentencing practices (including the Israeli/American prosecutions and

white collar sentences handed down in this district) and based upon the facts before the Court and the extensive experience in sentencing felony defendants of the undersigned, it is concluded this case falls outside the heartland · of traditional money laundering cases. A downward departure is therefore justified. .

## THE EXTENT OF THE DOWNWARD DEPARTURES

As directed by.the Fifth Circuit, the Court fashions a sentence based on § 2S1.2 of the guidelines. *Bart*, No. 96–50007, op. at 3, 117 F.3d 1416. The base offense level for both defendants is set at seventeen. As the loss did not exceed $100,000, there is no enhancement pursuant to 2S1.2(b)(2). However, as it was known the funds were proceeds of a specified unlawful activity, there is an increase of two levels pursuant to U.S.S.G. § 2S1.2(b)(1)(B). In addition, as there was an abuse of a position of trust, there is a further increase of two levels pursuant to U.S.S.G. § 3B1.3. There is also a two level increase for obstruction of justice under U.S.S.G. § 3C1.1. Neither defendant is entitled to a downward adjustment for acceptance of responsibility. Thus, as to each defendant, a total offense level of twenty-three is set, with a criminal history category of I, resulting in a guideline imprisonment range of forty-six to fifty-seven months. In departing downward, the Court sets an imprisonment term of twenty-one months for each defendant.

■ As a final matter, the district court must demonstrate the extent of the departure is reasonable by analogy to the guidelines. 18 U.S.C. § 3742(f)(2); *see also Williams v. United States*, 503 U.S. 193, 202, 112 S.Ct. 1112, 1120, 117 L.Ed.2d 341 (1992) (if reviewing court concludes decision to depart was not result of erroneous interpretation of guidelines, it must then determine whether resulting sentence is unreasonably high departure from relevant guideline

---

7. WILLIAM SHAKESPEARE, HAMLET, PRINCE OF DENMARK act 3, sc. 2 ("The lady doth protest too much, methinks.").

8. WILLIAM SHAKESPEARE, ROMEO AND JULIET act 2, sc. 2 ("What's in a name? That which we call a rose by any other name would smell as sweet.").

range).[9] The superseding indictment charges in counts one through twenty-one a complex series of fraudulent activity constituting mail fraud and wire fraud. As part of each count, the prosecution alleged in forty-seven parts "THE SCHEME AND ARTIFICE" to defraud. Paragraphs twenty-one through sixty-five and sixty-nine, seventy and seventy-one of each mail and wire fraud count describe "the scheme and artifice to defraud the United States and to obtain money by means of false and fraudulent pretense, representations and promises." Paragraph seventy-three of the interstate transport count charges defendants with transporting funds "taken by fraud." Paragraph seventy-five of the money laundering counts reads:

> [Defendants] did knowingly engage and attempt to engage in monetary transactions affecting interstate commerce, in criminally derived property of a value of greater than $10,000, this is, certain monetary transfers, such property having been derived from specified unlawful activity, that is mail fraud, wire fraud. . . .

At trial, it became clear the factual components of the money laundering and interstate transportation counts are contained in the mail fraud and wire fraud counts. According to the presentence report, each defendant's guideline range is doubled by the use of the money laundering and interstate transport guidelines in addition to or instead of the guidelines related to mail fraud and wire fraud. Thus, adding the money laundering and interstate transportation charges only serves to greatly increase the sentencing range each defendant faces for conduct and financial transactions already encompassed in the mail and wire fraud counts. The Court heeds the pre-*Koon* words of the Fifth Circuit that the *de minimis* nature of the money laundering conduct can never justify departure. *United States v. Willey*, 57 F.3d 1374, 1392 (5th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 675, 133 L.Ed.2d 524 (1995). However, as noted above, an argument can be made that any pre-*Koon* case holding that a factor can never justify departure is no longer good law. *Brock*, 108 F.3d at 35; *Kalb*, 105 F.3d at 428–29. Nonetheless, in an abundance of caution, the Court employs this analysis solely for the basis of establishing the reasonableness of the departure.

Another analogous guideline is U.S.S.G. § 2C1.7, which covers fraud involving the deprivation of the right to the honest services of appointed officials and fraud involving the interference of governmental functions. For purposes of the objective criminal conduct, there appears to be little difference between defendants' money laundering activities and the conduct in a typical section 2C1.7 case. Bearing this in mind, had defendants been sentenced for fraud involving the deprivation of the right to honest services, the total offense level for Mr. Stewart would be eighteen and the guideline range would be twenty-seven to thirty-three months imprisonment. Mr. Bart's total offense level would be sixteen, and the guideline range would be twenty-one to twenty-seven months in prison. Although the Fifth Circuit prohibited this Court from computing Mr. Bart's and Mr. Stewart's sentences using this guideline, *Bart*, No. 96–50007, op. at 2–3, 117 F.3d 1416, this analogy to section 2C1.7 illustrates the reasonableness of the extent of departure when sentencing these defendants under the money laundering guidelines.

### THE GOVERNMENT'S BURNS OBJECTION

The government disingenuously says it did not receive a *Burns* notice, implying the gov-

---

9. The Seventh Circuit has decided that *Koon* did not remove the requirement that the district court explain the extent of a departure by analogy to the guidelines. *United States v. Horton*, 98 F.3d 313, 319 (7th Cir.1996); *see also United States v. Barajas–Nunez*, 91 F.3d 826, 834 (6th Cir.1996) ("Although *Koon* has changed the standard of review to an abuse of discretion standard, the rationale for requiring an explanation of reasons for departure and the extent thereof still remains"). The Ninth Circuit, on the other hand, decided en banc that *Koon* effectively overruled its earlier holding that a departure requires a comparison to analogous guideline provisions. *United States v. Sablan*, 114 F.3d 913, 919 & n. 10 (9th Cir.1997); *see also United States v. Hardy*, 99 F.3d 1242, 1253 (1st Cir.1996) ("A sentencing court is not required to dissect its departure decision, explaining in mathematical or pseudo-mathematical terms each microscopic choice made."). The Court did note, however, "[a]n analysis and explanation by analogy ... may still be a useful way for the district court to determine and explain the extent of departure, but it is not essential." *Sablan*, 114 F.3d at 919 n. 10.

ernment did not know the Court might depart on resentencing. *Burns v. United States*, 501 U.S. 129, 131 & 135 n. 5, 111 S.Ct. 2182, 2183–84 & 2185–86 n. 5, 115 L.Ed.2d 123 (1991) (district court required to give notice to government before *sua sponte* departing downward from applicable guideline range). The Court had assumed the government read the Fifth Circuit's opinion on remand directing this Court to "reconsider the vague factors it cited to justify departure in light of the Guidelines, the Supreme Court's opinion in *Koon,* and this opinion." *Bart,* No. 96–50007, op. at 4, 117 F.3d 1416. The Court fails to see how one more piece of paper telling the government the amount of punishment will be in issue at resentencing would shed light on the already well-illuminated. The *Burns* objection is overruled.

## CONCLUSION

It is this author's humble and respectfully submitted opinion, after almost nineteen years of judicial decision making, that twenty-one months for each defendant is just punishment. Given this Court's opportunity to see and hear the defendants on resentencing, the Court is unhesitatingly convinced of rehabilitation and deterrence from any future violation. Both defendants are under Court supervision for the next three years. Sending them back to prison accomplishes nothing but the Orwellian absurdity of spending as much to reincarcerate them as is sought in restitution. The punishment nightmares continue for Mr. Bart and his family because of the government's unilateral actions resulting in the terror of his rearrest. Mr. Bart poignantly said at his resentencing: "I just want my life back."

Moreover, as set forth in detail above, the common sense goal of consistency in sentencing within this district and in comparison with related Israeli/American cases is met with a twenty-one month term. Had this case been brought by Department of Justice lawyers located in the Western District of Texas, it likely would have been over in 1994 with far less expense, far fewer trees con-

sumed and punishment at about twenty-one months. To accede to the government's tunnel visioned insistence on approximately twice the prison time would miss the target of consistency, would achieve no societal benefit, would cost the American taxpayers a minimum of almost $73,000 in prison expenditures and would take up two spaces in an already overcrowded system, spaces better reserved for the human predators among us.[10]

Although no perfect remedy or punishment can be fashioned which pleases everyone, the Court is confident that the goals of justice, the Sentencing Commission and the Congress are properly met. Over the span of eternity, there is little difference among, and nothing to be gained from, additional incarceration of these defendants, be it twenty-four, thirty, thirty-seven or forty-six months.

Implanted with the totality of the reasons stated herein is a strong visceral reaction, located somewhere between the sternum and the navel, that what the government wants to do and has done to these defendants is excessive and outside the heartland; nor do some government tactics receive an acceptable grade in an examination by the olfactory senses.

Despite the well intentioned exuberance of government counsel, to follow the guidelines in this atypical case would cross the line from prosecution to persecution. Some other authority will have to see to the approval of the government's endeavors and its goal to extract more life and liberty from defendants Bart and Stewart. This Court chooses not to have its hands sullied.

It is so ORDERED.

---

**10.** The average cost for maintaining a prisoner is approximately $21,352 per year. U.S. Dep't of Just., Jud. Guide to the Fed. Bureau of Prisons 5 (1995). The government seeks to spend a minimum of $88,966.50 and a maximum of $128,-111.76, the cost of maintaining these defendants in prison for additional time. Federal prisons are currently operating at 124% of capacity.